**AFFIRM in Part, and REVERSE and REMAND; Opinion Filed August 5, 2014.**



In The

# Court of Appeals
# Fifth District of Texas at Dallas

**No. 05-12-00321-CV**

**AMERIPATH, INC. AND DFW 5.01(A) CORPORATION, Appellants**

**V.**

**STEVEN HEBERT, Appellee**

**On Appeal from the 199th Judicial District Court**
**Collin County, Texas**
**Trial Court Cause No. 199-03680-2009**

## OPINION

Before Justices Bridges, Fillmore, and Lewis
Opinion by Justice Lewis

AmeriPath, Inc. ("AmeriPath") and DFW 5.01(a) Corporation ("DFW") appeal the trial court's judgment, which finalized a series of summary judgments and separate legal rulings, and which awarded attorney's fees to appellee Steven Hebert. In four issues, appellants contend the trial court erred by (1) denying their motion to confirm an arbitration award, (2) granting summary judgment on appellants' contract counterclaims against Hebert, (3) granting summary judgment on appellants' tort counterclaims against Hebert, and (4) granting Hebert attorney's fees. We affirm the trial court's judgment in part, and we reverse and remand the remainder of the case for further proceedings consistent with this opinion.

# I.
## BACKGROUND

Hebert is a pathologist. He began his employment relationship with appellants in September 1998, when he contracted with DFW—a Texas nonprofit corporation that is wholly owned by AmeriPath—to provide professional services on its behalf (the "1998 Agreement"). In September 2002, Hebert and DFW amended the 1998 Agreement; the new contract was titled Amendment to Employment Agreement (the "First Amendment"). The First Amendment contained a recital that made specific reference to the 1998 Agreement and said the parties wished to amend their agreement. In February 2005, Hebert signed a third contract, this one titled Second Amendment to Employment Agreement (the "Second Amendment"), which again contained recitals, this time referring specifically to both the 1998 Agreement and the First Amendment. And finally, Hebert signed a fourth contract, titled simply Employment Agreement, in January 2008 (the "2008 Agreement"), which contained recitals referring to the 1998 Agreement, the First Amendment, and the Second Amendment. In each of the four agreements, Hebert was defined as the "Employee," his employer was defined as the "Company," and the Company was consistently defined as "a Texas not for profit corporation certified to practice medicine by the Texas Board of Medicine pursuant to Section 5.01(a) of the Texas Medical Practices Act." However, in the 1988 Agreement and the First Amendment, the not for profit company is "DFW 5.01(a) Corporation," and in the Second Amendment and the 2008 Agreement, the not for profit company is called "AmeriPath DFW 5.01(a) Corporation" ("ADFW"). The record indicates neither party realized this name change had occurred until well into the litigation at hand, but the change has shaped the litigation from the point of realization forward.

During the period of his employment, Hebert became a director and an officer of DFW. The record indicates that Hebert was appointed Vice President of nine Texas non-profit

corporations, including DFW.[1]   Hebert's appointment was made in a 2004 joint resolution approved by the three members of the AmeriPath Board of Directors—one of whom was Hebert—and the "Sole Member," AmeriPath.[2]   In 2008, Hebert became the Managing Director of DFW.

All of Hebert's employment agreements contained covenants not to compete.  The covenant in the 2008 Agreement became relevant when—in 2009—Hebert resigned and went to work for a competitor, ProPath Associates ("ProPath").  His move was facilitated by a contract he signed in 2008 with an AmeriPath client, Columbia Medical Center of McKinney (the "Hospital"), on behalf of DFW (the "Hospital PSA").  The Hospital PSA contained a key-man provision, which essentially provided that if Hebert was no longer employed by DFW, then his agreement not to compete was waived as to the Hospital.  Thus, when Hebert resigned, the client Hospital followed him to ProPath, and Hebert took the position he was not violating his 2008 Agreement.  The parties have starkly different views of how the Hospital PSA was negotiated and signed.  It is undisputed that a second, different agreement was being negotiated at the same time between AmeriPath and HCA, Inc., the Hospital's parent company.  This new agreement would have governed DFW's relationship with the Hospital.  While both forms of the agreement contained a key-man provision, the form Hebert signed was much more favorable to him if he were to leave his employment as he did in 2009.  Hebert contends he thought he was signing the form of agreement AmeriPath had negotiated; AmeriPath contends Hebert negotiated his own deal with the Hospital and signed that form of the agreement without authority from AmeriPath.

---

[1] The other corporations for whom Hebert served as Vice President were Arlington Pathology Association 5.01(a) Corporation, AmeriPath Lubbock 5.01(a) Corporation, NAPA 5.01(a) Corporation, AmeriPath PAT 5.01(a) Corporation, AmeriPath Severance 5.01(a) Corporation, AmeriPath San Antonio 5.01(a) Corporation, Simpson Pathology 5.01(a) Corporation, and TXAR 5.01(a) Corporation.

[2] It is unclear in the record when Hebert became a director of these corporations, except that it was sometime before the 2004 resolution.

AmeriPath opposed Hebert's employment with ProPath, relying on the covenant not to compete in his 2008 Agreement (the "Noncompete"). That agreement contained a legislatively mandated provision allowing Hebert to buy out the Noncompete. It provided:

> The Employee is entitled to buy out of these Non-Competition and Non-Solicitation provisions at a reasonable price as agreed to by the Employee and the Company, or, at the option of either party, as determined by a mutually agreed upon arbitrator, or, in the case of an inability to agree, an arbitrator of the court whose decision shall be binding on all parties.

The parties attempted to reach agreement on a "reasonable price," but they were unsuccessful.

In September 2009, Hebert sued ADFW (using the employer's name on his 2008 Agreement), seeking an injunction preventing ADFW from interfering with his employment with the Hospital and a declaration that his Noncompete with ADFW was unenforceable; Hebert also pleaded a claim for tortious interference with his employment relationship with the Hospital. DFW answered (under the name ADFW) and filed counterclaims against Hebert for breach of contract, unfair competition, misappropriation of trade secrets, breach of fiduciary duty, harmful acts by computer, civil conspiracy, and tortious interference. DFW also sought injunctive and declaratory relief of its own. Soon thereafter, DFW joined ProPath in the suit and pleaded a crossclaim against ProPath for tortious interference and civil conspiracy.

In October 2009, the parties informed the trial court they had come to an agreement to arbitrate the Noncompete buyout amount in accordance with the 2008 Agreement. The arbitrator determined the reasonable buyout price was $2,580,175. But Hebert did not follow through with the buyout. Instead, he continued to argue the Noncompete was unenforceable. The parties returned to the trial court, and litigation continued over their various claims.

On September 7, 2010, Hebert filed his Third Amended Petition, re-captioning the lawsuit with two defendants: AmeriPath and DFW. Almost immediately, appellants asked the trial court to confirm the arbitration award; Hebert opposed confirmation.

Hebert also filed a motion for partial summary judgment, seeking a declaration that he was not bound by the Noncompete. The trial court granted the motion, concluding the employment contract was invalid because the named contracting entity, ADFW, did not exist (the "First Summary Judgment"). At the same time, the trial court vacated the arbitration award. DFW filed an interlocutory appeal, seeking to have this Court overturn the order to vacate.

Early in the litigation, the parties had entered into an agreed temporary injunction to prevent Hebert's competing. After prevailing in the summary judgment and confirmation proceedings, Hebert moved to modify the injunction to remove any prohibition against competition or solicitation, and the trial court granted the motion. DFW also filed an interlocutory appeal on this ground.[3]

The trial court went on to grant summary judgment in Hebert's favor on all of appellants' counterclaims and crossclaims (the "Second Summary Judgment"), and to award Hebert attorney's fees. Hebert moved to have his own tort claims severed; the trial court granted the motion and signed a final judgment. Appellants then filed their third appeal. We consolidated the three appeals.

## II.
### WAIVER OF ALL APPELLATE ISSUES

At the outset, we address Hebert's contention that appellants have waived their issues on appeal by requesting that the trial court enter the judgment it did, without specifically noting their disagreement as to the substance of the judgment proposed.[4] Hebert acknowledges that he tendered his own proposed final judgment to the trial court. However, he argues, appellants

---

[3] The trial court's final judgment in this case has rendered the appeal of the temporary injunction moot. *Isuani v. Manske-Sheffield Radiology Group, P.A.*, 802 S.W.2d 235, 236 (Tex. 1991) ("If, while on the appeal of the granting or denying of the temporary injunction, the trial court renders final judgment, the case on appeal becomes moot."). Accordingly, all previous orders pertaining to the temporary injunction are set aside. *Id.*

[4] This is the first of many waiver arguments made by Hebert throughout his briefing. We address all of Hebert's waiver arguments that are properly briefed and require discussion. Any waiver arguments not specifically addressed in this opinion are decided against him.

responded by sending a letter to the trial court that "rejected" Hebert's proposed judgment and tendered their own proposed judgment. Hebert argues that because appellants' proposed judgment did not include the language "approved as to form only" or "any similar specific reservation of the right to appeal," appellants have waived all issues on appeal. We disagree.

During the trial court's hearing on Hebert's request for attorney's fees, Hebert made a proposal to the trial court and appellants to finalize the portion of the litigation that had already been decided. Hebert's counsel set forth the proposal stating:

> [W]e were moving for attorneys' fees now in order to get the Court's ruling on attorneys' fees for this reason: That if Your Honor grants the attorneys' fees that we're requesting, if you sign the order that we're going to submit to you later, we will, the next day, file a motion to sever the three torts, remaining claims for trial from the claims on which you've granted summary judgment and made a ruling on the attorneys' fees.
>
> We will then -- and again, assuming Your Honor grants that motion, assuming opposing counsel doesn't oppose it, we will then move to -- for a final judgment, that you enter a final judgment in the -- on the claims as to which you granted summary judgment and on the attorneys' fees. That will permit opposing counsel to take the appeal and obtain review of the rulings that they've been very much wanting to do to this point.
>
> You know, at the same time, Your Honor, or immediately after that point, we would agree to move to continue trial of the three tort claims, the ones that are now severed in a new cause of action and a new cause number, and, essentially, leave those three claims pending while AmeriPath takes its appeal of the underlying rulings, which they, obviously, believe very confidently they're going to get reversed on appeal.

Counsel for appellants declined Hebert's proposal on behalf of his clients, and the hearing on attorney's fees proceeded. The court did not rule from the bench. Hebert's counsel sent a letter to the trial court several days later, repeating his promise—if the attorney's fees were awarded—to move (a) to sever his remaining claims, and (b) to enter judgment. And approximately two weeks later, the trial court signed an order awarding fees to Hebert.

Hebert circulated a proposed judgment based on the trial court's ruling.[5] Appellants' counsel explained in a letter to the trial court that he could not agree with Hebert on the form of the judgment. Appellants made two requests of the trial court: to exclude any recitation of facts in the judgment pursuant to rule 299a[6] and to rule on two pending motions to compel "in order to include them in [appellants'] appeal if necessary." The trial court subsequently signed appellants' proposed form of the judgment.

Hebert argues that appellants have waived all issues on appeal because the trial court signed appellants' form of judgment, and that judgment did not state it was "approved as to form only" or specifically reserve its right to appeal. Hebert relies on a series of cases declaring that if a party moves the trial court to enter a particular judgment, the party cannot later complain of that judgment. *See, e.g., D/FW Commercial Roofing Co., Inc. v. Mehra*, 854 S.W.2d 182, 190 (Tex. App.—Dallas 1993, no writ) (party who files motion for judgment, inducing court to render a certain judgment, cannot later complain of that judgment); *see also Litton Indus. Products, Inc. v. Gammage*, 668 S.W.2d 319, 321-22 (Tex. 1984); *Henry Bldg., Inc. v. Milam*, No. 05-99-01400-CV, 2001 WL 246882, at *2 (Tex. App.—Dallas Mar. 14, 2001, pet. denied). In this case, however, it is apparent that Hebert—not appellants—induced the trial court to reduce its interlocutory rulings to a final judgment by severing out the remaining claims.

Moreover, the form of judgment appellants proffered to the trial court did not constitute an argument that appellants later abandoned for a contrary position. Appellants did not argue one thing in the trial court and a different thing in this Court. *Litton Indus. Prods., Inc.*, 668 S.W.2d at 321–22 ("By filing its motion that the trial court render judgment on the verdict for the actual damages found by the jury, Litton could not, on appeal, take a position inconsistent with

---

[5] Hebert's counsel also circulated a motion to continue the trial date and to sever Hebert's remaining tort claims against AmeriPath as well as proposed orders on each of those matters. Appellants' counsel approved those orders as to form.

[6] The rule directs: "Findings of fact shall not be recited in a judgment." TEX. R. CIV. P. 299a.

that part of the judgment."). Instead, appellants participated in the routine task of proposing a judgment that is in accord with the trial court's rulings in preparation for appeal. "There must be a method by which a party who desires to initiate the appellate process may move the trial court to render judgment without being bound by its terms." *First Nat'l Bank of Beeville v. Fojtik*, 775 S.W.2d 632, 633 (Tex. 1989). When a party merely provides a draft judgment to conform to what the court has indicated its judgment would be, there is no waiver of the appeal. *Glattly v. Air Starter Components, Inc.*, 332 S.W.3d 620, 636 (Tex. App.—Houston [1st Dist.] 2010, pet. denied). In this case, Hebert made a proposal to appellants and the trial court that the existing rulings be finalized through severance and entry of a final judgment. Hebert more than once stressed that his plan would allow appellants to take their appeal on those existing rulings. When the trial court ruled on fees as Hebert had asked, Hebert proposed a judgment in line with the court's interlocutory rulings. Appellants corrected that proposed judgment to comply with the rules of civil procedure. But appellants took no step that amounted to an abandonment of their legal positions at trial or their stated desire to appeal the trial court's rulings.

We conclude appellants have not waived any appellate issue that is otherwise preserved for our review by responding to, and correcting, the judgment Hebert proposed to the trial court.

## III.
### HEBERT'S FIRST SUMMARY JUDGMENT:
### VALIDITY OF THE EMPLOYMENT CONTRACT

Appellants seek our resolution of issues involving vacation of the arbitration award, dismissal of appellants' contract and tort claims, and the award of attorney's fees to Hebert. As a first step in resolving those specific issues, we must address the trial court's preliminary rulings, which formed the foundation for subsequent rulings as the litigation continued. The threshold substantive issue in this appeal is whether Hebert was party to a valid employment contract.

## Waiver

Again, Hebert argues waiver. This time he points to the trial court's first partial summary judgment ruling. In that ruling, on Hebert's own declaratory judgment claim, the court stated:

> It is further **ORDERED** AND **ADJUDGED** that [Hebert's] motion for summary judgment regarding Dr. Hebert's asserted contractual non-compete obligation to defendants is **GRANTED** on the ground that the entity with whom Dr. Hebert is asserted to have had a written employment agreement containing the non-competition provision—"AmeriPath DFW 5.01(a) Corporation"—did not exist at the time that Dr. Hebert was tendered and signed the written agreement and no contract can be made with or formed by a non-existent entity.

Hebert contends appellants failed to challenge this ruling on appeal. Again, we disagree. Appellants' brief contains no fewer than nine pages of legal arguments addressing why the trial court was wrong in deciding that no valid employment agreement existed between Hebert and DFW. Appellants brief these arguments as the preface to their contention that the trial court incorrectly granted summary judgment on appellants' contract claims against Hebert. Moreover, in their summary of the brief's argument, appellants point out how the trial court's no-agreement summary judgment ruling affected all the issues that followed, saying:

> Dr. Hebert now seeks to void the Arbitration Award, his non-compete, and his common law duties to DFW on the sole basis that the latest version of the parties' employment agreement included the word "AmeriPath" before DFW's full name. . . . [T]he insertion of a single word before an employer's legal name in an employment contract does not preclude the employer from bringing suit, does not invalidate the contract, and certainly does not provide a basis for denying confirmation of an arbitration award or preventing the employer from seeking remedies in tort. *This fundamental error, which permeates nearly all of the issues presented*, is contrary to no less than four legal principles governing arbitration agreements and 10 legal principles governing contracts. (Emphasis added.)

Faced with a similar waiver claim, the supreme court concluded that a party need not identify a separate issue for each substantive matter that would be addressed on appeal. *See Perry v. Cohen*, 272 S.W.3d 585, 588 (Tex. 2008) (party did not waive challenge to special exceptions order when it addressed the merits of that order under an issue challenging dismissal of its suit). "[W]e liberally construe issues presented to obtain a just, fair, and equitable

adjudication of the rights of litigants." *Id.* (quoting *El Paso Natural. Gas v. Minco Oil & Gas, Inc.*, 8 S.W.3d 309, 316 (Tex. 1999)).  Our briefing rules provide that an appellant's issue or point will be treated as covering every subsidiary question that is fairly included within its statement.  TEX. R. APP. P. 38.1(f).  We conclude appellants' brief as a whole, and specifically their second issue, fairly includes a challenge to the trial court's summary judgment ruling that Hebert was not subject to a valid employment contract.  Appellants have not waived that argument on appeal.

### Misnomer

Hebert's first motion for summary judgment sought a declaration that Hebert was not subject to a contractual non-competition obligation because the entity with which he allegedly had an employment agreement did not exist at the time the agreement was signed, and no contract can be formed with an entity that does not exist.  The trial court granted the motion on that ground.  We review the court's summary judgment order de novo.  *Travelers Ins. Co. v. Joachim*, 315 S.W.3d 860, 862 (Tex. 2010).  As movant, Hebert had the burden of showing that no genuine issue of material fact existed and that he was entitled to judgment as a matter of law.  *City of Dallas v. Dallas Morning News, LP*, 281 S.W.3d 708, 712 (Tex. App.—Dallas 2009, no pet.).

Our primary concern in reviewing Hebert's first summary judgment motion is to ascertain the true intentions of the parties to the contract. *Coker v. Coker*, 650 S.W.2d 391, 393 (Tex. 1983).  "Written contracts will be construed according to the intention of the parties, notwithstanding errors and omissions." *Am. 10–Minute Oil Change, Inc. v. Metro. Nat'l Bank–Farmers Branch*, 783 S.W.2d 598, 600 (Tex. App.—Dallas 1989, no writ).  Unless the contract's language is ambiguous, contract interpretation is a legal question that we review de novo.  *Coker*, 650 S.W.2d at 393.

–10–

### *Law of Misnomer*

Appellants' summary judgment response offered five legal arguments for the enforceability of the 2008 Agreement, all centered on their contention that the actual employer was DFW.[7] We conclude appellants' theory of misnomer is dispositive and sufficient to establish that Hebert's First Summary Judgment must be reversed. "A misnomer occurs when a party misnames itself or another party, but the correct parties are involved." *In re Greater Houston Orthopaedic Specialists, Inc.*, 295 S.W.3d 323, 325 (Tex. 2009) (per curiam) (orig. proceeding).[8] Courts will allow parties to correct a misnomer so long as no one was misled by the mistake. *Id.* Misnomers have been corrected in pleadings, judgments, and contracts. *See id.* (misnomer in non-suit); *Hasty v. Keller HCP Partners, L.P.*, 260 S.W.3d 666, 670 (Tex. App.—Dallas 2008, no pet.) (misnomer in lease guaranty); *Chen v. Breckenridge Estates Homeowners Ass'n, Inc.*, 227 S.W.3d 419, 420 (Tex. App.—Dallas 2007, no pet.) (misnomer in judgment). The rule as to misnomers in contracts, even for a corporate party, is well settled:

> Modern law has departed from the strict rules of the common law as to use of the corporate name. As corporations are now able to contract almost as freely as natural persons, it is held that a departure from the strict name of a corporation will not avoid its contract if its identity substantially appears.

*Houston Land & Loan Co. v. Danley*, 131 S.W. 1143, 1144 (Tex. Civ. App. 1910, no writ); *see also W.B. Clarkson & Co. v. Gans S.S. Line*, 187 S.W. 1106, 1110 (Tex. Civ. App.—Galveston 1916, writ ref'd) ("Thus, the general rule is that a misnomer of a corporation has the same effect as the misnomer of an individual, and when the true name is to be collected from the instrument involved, or is shown by proper averments, the contract is not invalidated thereby.").

---

[7] Appellants argued and offered summary judgment evidence on theories of misnomer, assumed name, ratification and partial performance, ambiguity, and mutual mistake.

[8] The supreme court has distinguished a misnomer from a misidentification, stating that the latter "arises when two separate legal entities exist and a plaintiff mistakenly sues an entity with a name similar to that of the correct entity." *Greater Houston Orthopaedic Specialists*, 295 S.W.3d at 325 (citing *Chilkewitz v. Hyson,* 22 S.W.3d 825, 828 (Tex. 1999)). This case cannot embody a misidentification; Hebert has consistently acknowledged that ADFW never existed.

Accordingly, our analysis centers on two questions: (1) was Hebert misled by the fact that the 2008 Agreement named his employer as ADFW rather than DFW, and (2) is DFW's identity substantially apparent from the 2008 Agreement. Finally, we look to the summary judgment evidence to determine whether the parties intended and believed the contracting party to be DFW. *See Coker*, 650 S.W.2d at 393 (our primary concern is to ascertain true intentions of parties to contract).

### *Was Hebert Misled?*

Hebert did not contend in his summary judgment motion that he was misled by the naming of ADFW as his employer; he offered no argument or summary judgment evidence to that effect. Appellants, however, offered summary judgment evidence that Hebert was not misled or disadvantaged in any way by the incorrect name.

Appellants' summary judgment evidence included all four of Hebert's employment agreements. Hebert's Second Amendment contained the same misnomer as the 2008 Agreement: it identified ADFW as his employer rather than DFW. But the record indicates Hebert worked through the term of the Second Amendment without incident or adverse effect caused by the mistake. Likewise, none of the complaints that Hebert contends led to his resignation under the 2008 Agreement bore any relationship to the name (or misnaming) of his employer. Hebert narrates the following in his brief:

> During the whole of 2008 and throughout 2009, AmeriPath was perpetually short staffed in North Texas, resulting in unreasonable pressure on and diminished morale among the physician ranks. AmeriPath's failure to provide coverage and support for Hebert resulted in him suffering stress, marital discord, family turmoil, and mental anguish.

Likewise, Hebert's resignation letter (which is included in appellants' summary judgment evidence) speaks of missing family summer vacations in both 2008 and 2009, and of his lack of authority and time to address management issues in his role as Managing Director.

–12–

Our review of the summary judgment record indicates the parties were indifferent to the correct name of the "Company" in Hebert's agreements until mid-litigation. There is no summary judgment evidence that Hebert was treated differently—or conducted himself differently—than he would have had DFW been properly named in the 2008 Agreement. Nor is there any summary judgment evidence that DFW has attempted to avoid its own contractual obligations based on the misnomer. We cannot say Hebert was somehow misled to his detriment by the misnaming of his employer.

### *Was DFW's Identity Substantially Apparent?*

Our second inquiry is whether DFW's identity was substantially apparent from the 2008 Agreement and proper averments. *See Clarkson*, 187 S.W. at 1110. We look initially to the language identifying the parties to the 2008 Agreement. In that agreement—and in all of the previous three agreements—Hebert is defined as the "Employee," his employer is defined as the "Company," and the Company is defined as "a Texas not for profit corporation certified to practice medicine by the Texas Board of Medicine pursuant to section 5.01(A) of the Texas Medical Practices Act." Moreover, in the 2008 Agreement—just as in the 1998 Agreement and the Second Amendment—the Company is acknowledged to be doing business as "AMERIPATH DALLAS."[9] The only true difference in the identification of the parties is the addition of the single word "AmeriPath" before "DFW 5.01(a) Corporation" in the Second Amendment and the 2008 Agreement.

We also look to the 2008 Agreement's recitals. As we described above, Hebert's second through fourth agreements contain recitals that refer back to earlier agreements. Thus, the 2008

---

[9] The First Amendment makes no reference to any d/b/a for the Company. Thus it is not inconsistent with the other three agreements in this respect.

–13–

Agreement contains recitals referring to the 1998 Agreement, the First Amendment, and the Second Amendment:

> **WHEREAS** the Employee entered into an Employment Agreement dated September 22, 1998 (the [1998 Agreement]); and
>
> **WHEREAS**, the Company and the Employee entered into an Amendment to the Employment Agreement dated October 16, 2002 (the [First] Amendment); and
>
> **WHEREAS**, the Company and the Employee entered into an Amendment dated January 1, 2005 [(the Second Amendment)].

A recital is "[a] preliminary statement in a contract or deed explaining the reasons for entering into it or the background of the transaction, showing the existence of particular facts. . . . Traditionally, each recital begins with the word whereas." *Furmanite Worldwide, Inc. v. NextCorp, Ltd.*, 339 S.W.3d 326, 336 (Tex. App.—Dallas 2011, no pet.) (quoting BLACK'S LAW DICTIONARY 1289 (8th ed. 2004)). We may look to recitals to determine proper construction of the contract and the parties' intent. *All Metals Fabricating, Inc. v. Ramer Concrete, Inc.*, 338 S.W.3d 557, 561 (Tex. App.—El Paso 2009, no pet.). In this case, it is apparent the recitals describe an unbroken course of dealing between the same parties, because each refers to the parties to the preceding agreement by the same term. Thus, the recitals support the conclusion that the parties to the 2008 Agreement were—for the fourth time—Hebert and DFW.

The summary judgment record establishes DFW's identity was substantially apparent to these parties in the 2008 Agreement.

***Summary Judgment Evidence of the Parties' Intent[10]***

Among the most significant evidence that the 2008 Agreement was intended to be between Hebert and DFW is the fact that the fundamental promises made by the Company in that agreement were performed by DFW. The Company promised to employ Hebert as a pathologist and as Managing Director of Hospital Services, and appellants' summary judgment evidence establishes that DFW did employ him—and that Hebert acted—in those capacities. The Company promised to pay Hebert a base salary "in accordance with the Company's regular payroll practices," and appellants' summary judgment evidence establishes that DFW did pay Hebert that base salary according to its regular payroll practices.[11]

Similarly, the summary judgment evidence of Hebert's own conduct and status during the term of the 2008 Agreement indicates he knew he was employed by DFW. The Hospital PSA (on which Hebert relies to argue against enforcement of the Noncompete) is a contract between the Hospital and DFW. Hebert himself signed the Hospital PSA specifically for DFW, and as DFW's Managing Director, the title given him in the 2008 Agreement. Hebert contends he was authorized to sign the Hospital PSA; his contention of authority in this context underscores his contractual relationship with DFW.[12]

---

[10] Hebert contends parol or extrinsic evidence is inadmissible to show misnomer. We disagree. *See, e.g., Weeks v. San Angelo Nat'l Bank*, 65 S.W.2d 348, 350 (Tex. Civ. App.—Austin 1933, writ ref'd) (parol evidence admissible to determine identity of one intended to be bound in misnomer case). The cases Hebert cites for exclusion under the parol evidence rule are not misnomer cases. Moreover. those cases acknowledge exceptions to the parol exclusion for contracts dealing with clarification of mistake, ambiguity, or similar issues. *See Cavaness v. Gen. Corp.*, 155 Tex. 69, 74 (1955) (fraud or mutual mistake); *Haobsh v. BeautiControl Cosmetics, Inc.*, No. 05-92-02218-CV, 1993 WL 209653, at *2 (Tex. App.—Dallas June 14, 1993, no writ) (not designated for publication) (mutual mistake; discussed substantively *infra*). We conclude misnomer belongs in this category of exceptions because it employs extrinsic evidence not to vary the terms of the agreement, but to determine the parties' actual intent.

[11] Appellants' evidence also established DFW provided Hebert with his W-2 form for tax purposes.

[12] We note as well that throughout the time period relevant to this lawsuit, Hebert was a Vice President of DFW. Hebert certainly can be charged with knowledge of DFW's employment decisions as to its Managing Director. Hebert offers no evidence that DFW intended to assign employment of its Managing Director to an entity other than DFW.

*Hebert's Non-Existence Argument*

Hebert argued, and prevailed below, on the ground that ADFW did not exist and, therefore, could not enter into a binding contract. We do not quarrel with the settled rule that if one of the parties does not exist, no contract can be formed. *See, e.g., In re Hawthorne Townhomes, L.P.*, 282 S.W.3d 131, 138 (Tex. App.—Dallas 2009, orig. proceeding). But the application of that rule is not as simplistic as Hebert maintains.

Initially, Hebert cites generally to a list of cases reciting the rule that a non-existent entity cannot form a binding contract. These cases all involve questions of timing. In some, the party-entity's status may have changed at a critical time in the contractual relationship. *See id.* (argument involving timing of conversion of general partnership into limited partnership). In others, the party-entity was not formed until after the time a contract was signed or liability attached. *See, e.g., HTS Servs., Inc. v. Hallwood Realty Partners, L.P.*, 190 S.W.3d 108, 113 (Tex. App.—Houston [1st Dist.] 2005, no pet.) (limited partner seeking to recover funds was not formed until after consulting agreement was signed by other parties). In all these cases, the "non-existent" entity actually did exist at some point in time; the issue is whether it existed at the relevant time in each dispute. But ours is not a case in which the timing of ADFW's "formation" will resolve either party's claims. Indeed, it is undisputed that no corporate entity named ADFW ever existed. Therefore, these cases cannot resolve our inquiry.

Hebert next relies on an unpublished case from this Court, *Haobsh v. BeautiControl Cosmetics, Inc.*, 05-92-02218-CV, 1993 WL 209653 (Tex. App.—Dallas June 14, 1993, no writ)(not designated for publication), which he contends is "indistinguishable" from this case. In *Haobsh*, BeautiControl employed a letter agreement to appoint Cal Teck International Export, Inc. ("Cal Teck") its exclusive distributor of products in the Middle East for a six-month period. *Id.* at *1. Haobsh represented himself to be the principal of Cal Teck, presented a business card

with that name on it, and conducted correspondence with BeautiControl on stationery bearing that name. *Id.* Subsequently, Haobsh and an entity named Cal Tech International Export, Inc. ("Cal Tech") sued BeautiControl for breach of contract. *Id.* BeautiControl sought summary judgment, arguing neither plaintiff was party to the agreement. The plaintiffs did not argue misnomer; instead they sought reformation of the agreement based on a theory of mutual mistake. *Id.* at *2. As the opinion points out, such a reformation requires proof of two elements: (1) an original agreement, and (2) a mutual mistake, made after the original agreement, in reducing the original agreement to writing. *Id.* (citing *Cherokee Water Co. v. Forderhause,* 741 S.W.2d 377, 379 (Tex. 1987)). Thus, the *Haobsh* plaintiffs could prove mutual mistake only if BeautiControl and Cal Tech had intended to contract with each other, but "Cal Tech" was misspelled as "Cal Teck" when the agreement was reduced to writing. *Id.* However, the summary judgment evidence established BeautiControl was completely unaware of the existence of Cal Tech; it believed it was contracting with Cal Teck. *Id.* at *3. According to this Court, the plaintiffs failed to offer any evidence tending to show BeautiControl thought it was contracting with Cal Tech. *Id.* Instead, we held that BeautiControl's summary judgment evidence established that it intended to contract with Cal Teck, disproving the existence of a mutual mistake. *Id.*

In the case before us, the legal theory supporting our conclusion is not mutual mistake, but misnomer. Likewise, the summary judgment evidence establishes a very different factual scenario. DFW did not ever represent itself to Hebert as ADFW: there is absolutely no reference to ADFW outside the Second Amendment and the 2008 Agreement. Instead, Hebert and DFW shared a course of dealing that spanned many years before the 2008 Agreement was signed. The summary judgment evidence establishes that Hebert believed he was contracting

–17–

with DFW, and DFW believed it was contracting with Hebert. Thus, *Haobsh* does not control our disposition of this case.

In the end, we conclude this case does not fall within the ambit of cases addressing contracts with non-existing business entities. Instead, the summary judgment evidence makes clear that Hebert contracted with DFW, a corporation that existed at all relevant times in the parties' decade-long relationship. DFW proposed, Hebert accepted, and both of them performed the terms of the 2008 Agreement until Hebert's resignation. DFW was simply misnamed in that contract.

### Conclusion

In drafting the 2008 Agreement, DFW misnamed itself, but it is clear the parties to the employment contract were Hebert and DFW, not a non-existent entity. The record indicates Hebert was not misled, the identity of DFW was substantially apparent to Hebert, and the summary judgment evidence supports the conclusion that the actual intent of the parties was an employment agreement between Hebert and DFW. *See Greater Houston Orthopaedic Specialists, Inc.*, 295 S.W.3d at 325. Accordingly, we conclude Hebert failed to establish as a matter of law that there was not a binding contract between him and DFW. We conclude the trial court erred by granting Hebert's First Summary Judgment on this ground.

### IV.
### VALIDITY OF THE COVENANT NOT TO COMPETE

The second threshold issue before us is the validity of the 2008 Agreement's Noncompete. We have concluded that the trial court erroneously granted the First Summary Judgment on the ground that the named contracting party did not exist when the 2008 Agreement was signed. Accordingly, we must next examine the covenant not to compete contained within the 2008 Agreement to determine whether Hebert was bound by that covenant.

–18–

[A] covenant not to compete is enforceable if [1] it is ancillary to or part of an otherwise enforceable agreement at the time the agreement is made [2] to the extent that it contains limitations as to time, geographical area, and scope of activity to be restrained that are reasonable and do not impose a greater restraint than is necessary to protect the goodwill or other business interest of the promisee.

TEX. BUS. & COMM. CODE ANN. § 15.50(a) (West 2011).[13] The enforceability of a covenant not to compete is a question of law we review de novo. *Mann Frankfort Stein & Lipp Advisors, Inc. v. Fielding*, 289 S.W.3d 844, 848 (Tex. 2009).

### Statutory Requirements for Enforceability

As to the second requirement of the statute, Hebert challenged the geographical restriction placed upon his employment in the Second Summary Judgment proceeding. There, he contended that even if the 2008 Agreement were valid, the Noncompete would be unenforceable against him because it lacks appropriate geographic scope. In relevant part, the Noncompete provides:

[T]he Employee shall not, as a shareholder, principal, agent, consultant, manager, advisor, director, officer, control person, operator, or in any other capacity or manner whatsoever:

(1) directly or indirectly establish, become employed by or otherwise be substantively involved with a pathology practice operating anywhere within or in any county within fifty (50) miles of Dallas County, Texas (the "Restricted Territory");

(2) from any facility or location, whether within or without the Restricted Territory, knowingly (x) perform pathology services for any patient, medical facility, hospital, laboratory or health care provider located in the Restricted Territory, or (y) perform pathology services for any patient, medical facility, hospital, laboratory or health care provider who was or is (within the last six months of the date in question) a customer, client or patient of the Company.

---

[13] When the covenant relates to the practice of medicine, it also must contain "a buy out of the covenant by the physician at a reasonable price or, at the option of either party, as determined by a mutually agreed upon arbitrator or, in the case of an inability to agree, an arbitrator of the court whose decision shall be binding on the parties." *Id.* §15.50(b)(2). The 2008 Agreement did contain a buyout provision. We address that provision *infra*, in our discussion of the arbitration award in this case.

Hebert argues that Texas law limits a covenant not to compete to the geographical area where the employee worked, and he actually worked only in Dallas and Collin Counties. Hebert argues the clause, as written, is really unlimited in its scope because he cannot work for a pathology practice that operates within fifty miles of Dallas, even if he is working far from the Dallas area. In response below, appellants stated the fifty-mile restriction *was* related "to the region where [Hebert] was responsible for work" and was "necessary to protect appellants' business interests."

We have asserted that, as a general rule, a reasonable geographic restriction for covenants not to compete is the territory in which the employee actually worked while in the contractual employment. *Zep Mfg. Co. v. Harthcock*, 824 S.W.2d 654, 660 (Tex. App.—Dallas 1992, no writ). However, the breadth of enforceable geographical restrictions in covenants not to compete must depend on the nature and extent of the employer's business and the degree of the employee's involvement in that business. *Butler v. Arrow Mirror & Glass, Inc.*, 51 S.W.3d 787, 793 (Tex. App.—Houston [1st Dist.] 2001, no pet.). Hebert's arguments as to the appropriate territorial restriction are focused solely on his work as a pathologist at two hospitals. However, Hebert was also the Managing Director of DFW and an officer of nine different AmeriPath entities. Accordingly, appellants' interest in limiting Hebert's competition grew out of not only his employment as a pathologist, but also his service as a member of appellants' highest level management team. For this reason, we do not discern the Noncompete's limitation as to Hebert's affiliation with pathology practices that operate in the Dallas area as overly broad geographically: even if Hebert were working for such a company in New York, for example, his management knowledge of and experience with appellants' Dallas-area operations would be valuable to his new employer. We conclude Hebert failed to establish as a matter of law that his Noncompete was unreasonably broad in geographic scope.

–20–

Accordingly, the trial court erred by granting Hebert's First Summary Judgment on this ground.

<strong>Release and Discharge of the Noncompete Through Hospital PSA</strong>

In the Second Summary Judgment proceeding, Hebert also argued that even if the 2008 Agreement were valid, and even if the Noncompete were enforceable, appellants released and discharged him from the Noncompete as to the Hospital when it entered into the October 3, 2008 Hospital PSA. The parties to the Hospital PSA are identified in the agreement as Columbia Medical Center of McKinney Subsidiary, L.P. d/b/a Medical Center of McKinney (defined for purposes of the agreement as "Facility") and DFW 501(a) Corporation d/b/a AmeriPath North Texas (defined as "Contractor"). The agreement stated in relevant part:

> This Agreement is entered into for the purpose of securing the personal services of one or more individuals, namely: Steven Hebert, M.D. as well as others upon prior consent of Facility. It is agreed that the continued service of said individual(s) under this Agreement is a material obligation of Contractor. No substitution for said individual(s) may be employed under this Agreement without the prior consent of Facility. Any discontinuation of service by any of said individual(s), or any attempted substitution for any of said individual(s) without Facility's consent, shall be deemed a material breach of Contactor's obligations, entitling Facility to terminate this Agreement immediately and, at Facility's sole discretion, to enter into an employment or professional services agreement with said individual(s), any non-competition provisions of any agreement between the said individual(s) and Contractor to the contrary notwithstanding.

The circumstances surrounding the Hospital PSA are rife with fact issues. It is undisputed Hebert negotiated and signed the agreement on behalf of DFW. But the parties disagree as to whether he was authorized to do so. Moreover, there is summary judgment evidence that DFW and the Hospital's parent corporation were negotiating a separate agreement at the same time that would have included a very different key-man provision. Hebert has even testified he thought he was signing that latter agreement when he signed the Hospital PSA. DFW ultimately terminated the Hospital PSA, asserting that Hebert did not have authority to sign it and that his doing so

"represent[ed] an obvious conflict of interest." It would appear that genuine issues of material fact exist as to this basis for voiding the Noncompete.

But even if we were to assume, without deciding, that Hebert was authorized to sign the Hospital PSA on behalf of DFW—so that the agreement was valid and enforceable against DFW—Hebert has not shown he has a legal right to enforce the agreement for his own benefit. To have standing to enforce a contract, one must either be a party to the contract or a third-party beneficiary of the contract. *See Allan v. Nersesova*, 307 S.W.3d 564, 571 (Tex. App.—Dallas 2010, no pet.). "The fact that a person might receive an incidental benefit from a contract to which he is not a party does not give that person a right of action to enforce the contract." *MCI Telecomm. Corp. v. Tex. Utils. Elec. Co.*, 995 S.W.2d 647, 651 (Tex. 1999). Instead, a third party may claim rights under a contract made between other parties only if the parties both intended to secure a benefit to that third party and entered into the contract directly for the third party's benefit. *Id.*

Despite his argument to the contrary, Hebert is not a party to the Hospital PSA. The parties are clearly identified as the Hospital and DFW. And Hebert acknowledges he is not a third-party beneficiary of the Hospital PSA. Indeed, that document expressly states no such beneficiaries exist. Accordingly, Hebert may not legally claim a right—specifically the right to be released and discharged from his Noncompete—under the Hospital PSA. He simply lacks standing to do so. *See id.*

We conclude that Hebert failed to establish as a matter of law that the Noncompete could not be enforced against him.

## V.
### ARBITRATION AWARD

In their first issue, appellants contend the trial court erroneously denied their application to confirm the arbitration award valuing a buyout of Hebert's Noncompete. The arbitration

award was delivered on January 13, 2010. The arbitrator valued Hebert's Noncompete at more than $2.5 million. DFW filed an application to confirm the award. On September 29, 2010, Hebert filed a response to the application to confirm the arbitration award, raising two grounds for denial: (1) DFW was not a party to the arbitration or the award, and only a party may apply for confirmation; and (2) the award was obtained by fraud or other undue means, namely appellants "negligently misrepresented" to Hebert that ADFW was an existing entity.[14] The trial court denied appellants' application for confirmation. We review that ruling de novo. *In re Chestnut Energy Partners, Inc.*, 300 S.W.3d 386, 397 (Tex. App.—Dallas 2009, pet. denied).

### Timeliness of Hebert's Opposition to the Award

In this Court, appellants first contend Hebert's objections to the arbitration award were untimely, given that both the Federal Arbitration Act and the Texas General Arbitration Act require a party to object to an arbitration award within approximately ninety days after the party receives a copy of the award. *See* 9 U.S.C.A. § 12 (1947) ("Notice of a motion to vacate, modify, or correct an award must be served upon the adverse party or his attorney within three months after the award is filed or delivered."); TEX. CIV. PRAC. & REM. CODE ANN. § 171.088(b) (West 2011) ("A party must make an application under this section not later than the 90th day after the date of delivery of a copy of the award to the applicant."). Hebert's response to appellants' request for confirmation was filed September 29, 2010, more than nine months after the award was made. But Hebert argues that he is subject to a different deadline: the TGAA provides that a party seeking to vacate an arbitration award on the grounds of fraud, corruption, or undue means must make his objections "not later than the 90th day after the date the grounds for the application are known or should have been known." *Id.* Hebert's second ground for

---

[14] Hebert did not object to the amount of the arbitration award in the trial court. Nor did he make the argument he makes in this Court that the process of determining the buyout amount was not a true arbitration and ought not to be governed by either the Texas or federal law of arbitration. This argument was not preserved for our review.

opposing the arbitration award was his contention that the award was procured by fraud or undue means based on the "negligent misrepresentation" that ADFW was "an existing entity capable of contracting." Hebert learned of this purported misrepresentation—at the latest—September 7, 2010, the date he filed his Third Amended Petition alleging ADFW did not exist. Because this allegation forms the basis of one of Hebert's grounds for opposing the award, Hebert would have had ninety days (or three months) from September 7, 2010 to file his objections. We conclude his September 29, 2010 objection to the award on that ground—that the award was procured by fraud or undue means—was not untimely. *See id.* However, we conclude Hebert's objection to the award based on whether DFW was a party to the award has been waived because it was untimely.[15] *See id.*

**Undue Means**

The TGAA provides only four circumstances that support vacating an arbitrator's award; one of these is that the award was obtained "by fraud, corruption, or other undue means." *Id.* §171.088(a)(1). As the party objecting to confirmation and moving to vacate, it was Hebert's burden to establish one of the exceptions. *See Roehrs v. FSI Holdings, Inc.*, 246 S.W.3d 796, 804 (Tex. App.—Dallas 2008, pet. denied). Appellants challenge Hebert's contention that he demonstrated undue means in the trial court.[16] Whether under the Texas or federal standard, "undue means" connotes behavior that is immoral, illegal, or otherwise in bad faith. *Good Times Stores, Inc. v. Macias*, 355 S.W.3d 240, 244 (Tex. App.—El Paso 2011, pet. denied); *see also Matter of Arbitration Between Trans Chem. Ltd. & China Nat'l Mach. Imp. & Exp. Corp.*, 978 F. Supp. 266, 304 (S.D. Tex. 1997), *aff'd Trans Chem. Ltd. v. China Nat. Mach. Imp. & Exp. Corp.*,

---

[15] Because his objection was untimely, we need not address Hebert's argument that appellants waived a challenge to Hebert's objection that DFW was not a party to the arbitration award and, therefore, could not seek its confirmation.

[16] Although Hebert includes the word fraud occasionally in his pleadings and arguments, we conclude Hebert never attempted to plead or prove either fraud or corruption. If he had done so, those claims would fail for the same reason his undue-means argument fails: they require intentional conduct (fraud) or immoral conduct (corruption), neither of which are alleged by Hebert.

–24–

161 F.3d 314 (5th Cir. 1998). The term describes conduct that is purposeful and directed against another party. But Hebert has consistently identified the misnaming of DFW as negligent misrepresentation or as a mistake. In his opposition to the confirmation of the award, Hebert stated:

> From at least March 15, 2005 through July 13, 2010, [appellants] believed and represented to Dr. Hebert that a Texas non-profit corporation named [ADFW] existed and that he had an employment agreement with that entity that contained a non-competition provision.

Likewise, in his brief to this Court, Hebert refers to appellants' "own mistaken belief in the existence of ADFW." Neither a mistake nor a negligent misrepresentation approaches a standard that requires behavior that is immoral, illegal, or in bad faith. "[A] reviewing court is not authorized to set aside an arbitration award for a mere mistake of fact or law." *Las Palmas Med. Ctr. v. Moore*, 349 S.W.3d 57, 64 (Tex. App.—El Paso 2010, pet. denied). As a matter of law, Hebert did not establish that the arbitration award was obtained through undue means.

**Mootness**

Hebert makes one more argument concerning the arbitration award in this Court. He contends that a ruling as to the viability of the award would be moot because he (Hebert) decided not to "exercise his option" for the buyout. We express no opinion as to whether Hebert must buy out his Noncompete or whether his earlier decision not to do so is binding upon him. Many issues remain to be resolved when this case is remanded. The only one related to the arbitration award that is before us at this time is appellants' argument that the trial court erred by denying the request to confirm the arbitration award. Hebert has not shown that our resolution of this issue cannot have any impact on remand. We will, therefore, resolve the issue.

We have decided all of Hebert's arguments in opposition to confirmation of the award against him. We conclude the trial court erred by denying appellants' application to confirm the arbitration award. *See* TEX. CIV. PRAC. & REM. CODE ANN. § 171.087 (in absence of grounds for

–25–

vacating, modifying, or correcting award, court—on application of party—*shall* confirm the award). We sustain appellants' first issue. We reverse the trial court's denial of appellees' motion to confirm the arbitrator's award and remand this issue to the trial court for further proceedings.[17]

## VI.
### HEBERT'S SECOND SUMMARY JUDGMENT: APPELLANTS' COUNTERCLAIMS

After the trial court ruled the 2008 Agreement was not a valid agreement, concluded Hebert was not subject to the Noncompete, and refused to confirm the arbitration award, Hebert sought summary judgment on appellants' counterclaims against him.[18] Hebert's motion included both traditional and no-evidence grounds. The trial court granted Hebert's motion and dismissed appellants' contract and tort claims.[19]

Again, we review the grant of summary judgment de novo. *Joachim*, 315 S.W.3d at 862. We apply well-known standards in our review of traditional and no-evidence summary judgment motions. *See Timpte Indus., Inc. v. Gish*, 286 S.W.3d 306, 310 (Tex. 2009); *Nixon v. Mr. Prop. Mgmt. Co.*, 690 S.W.2d 546, 548 (Tex. 1985). With respect to a traditional motion for summary judgment, the movant has the burden to demonstrate that no genuine issue of material fact exists and it is entitled to judgment as a matter of law. TEX. R. CIV. P. 166a(c); *Nixon*, 690 S.W.2d at 548–49. We review a no-evidence summary judgment under the same legal sufficiency standard used to review a directed verdict. TEX. R. CIV. P. 166a(i); *Gish*, 286 S.W.3d at 310. To defeat a

---

[17] We agree with Hebert that the Noncompete provides for arbitration only to determine the reasonable price of the buyout. Our confirmation is limited to that finding in the arbitrator's award.

[18] The motion also addressed appellants' crossclaims against ProPath. Because ProPath is not a party to this appeal, we do not address its claims or those made against it.

[19] Hebert raised as one ground of his motion the legal argument that ADFW—the entity identified on the pleadings of the counterclaims—did not exist and so had no standing to urge any of these counterclaims. However, Hebert correctly anticipated the substitution of the appellant entities, and he made his summary judgment arguments separately against them. Accordingly, we address only the arguments made concerning appellants. The issue of ADFW's standing is moot; it is undisputed that appellants had standing to urge the counterclaims and to respond to Hebert's second motion for summary judgment.

no-evidence summary judgment, the nonmovant is required to produce evidence that raises a genuine issue of material fact on each challenged element of its claim. *Gish*, 286 S.W.3d at 310; *see also* TEX. R. CIV. P. 166a(i).

### Contract Claim

In their second appellate issue, appellants contend the trial court erroneously granted the Second Summary Judgment on their counterclaim for breach of the 2008 Agreement.[20] The counterclaim alleges Hebert breached the Noncompete (including its covenants concerning both competition and solicitation) of the 2008 Agreement. Hebert's second motion depended upon the First Summary Judgment's determination that the 2008 Agreement was not a valid employment agreement. The second motion did not address the merits of appellants' breach of contract claim.

Appellants' response below argued (a) the 2008 Agreement was a valid agreement, and (b) the Noncompete was valid and binding on Hebert. We have discussed those arguments— raised again in this Court—in our threshold analyses. We have concluded that Hebert failed to establish as a matter of law that the 2008 Agreement was invalidated by the misnaming of DFW: DFW was the actual party to the 2008 Agreement, and it had standing to bring a counterclaim against Hebert for an alleged breach of that contract. We have also concluded that Hebert failed to establish as a matter of law that the Noncompete is unenforceable. Accordingly, we conclude Hebert did not establish that he was entitled to judgment as a matter of law on appellants' counterclaim for breach of the 2008 Agreement. The trial court erred by granting summary judgment on that claim.

---

[20] Hebert also moved for summary judgment on certain oral agreements he referred to as "alleged agreements made during litigation." Appellants have not challenged the summary judgment on those grounds. Therefore, to the extent the court granted judgment on those claims, that portion of the judgment is affirmed.

We sustain appellants' second issue. We reverse the trial court's judgment on appellants' counterclaim for breach of the 2008 Agreement, and we remand that counterclaim for further proceedings.

## Tort Claims

In their third issue, appellants challenge the trial court's summary judgment dismissing their tort counterclaims against Hebert. The Second Summary Judgment dismissed appellants' claims for misappropriation of trade secrets, breach of fiduciary duty, tortious interference with existing and prospective contractual relationships, harmful acts by computer, and civil conspiracy. On appeal, appellants challenge the court's Second Summary Judgment on their claims of breach of fiduciary duty, tortious interference, and civil conspiracy.[21]

### *Breach of Fiduciary Duty*

The elements of a breach of fiduciary duty claim are: (1) a fiduciary relationship between the plaintiff and defendant; (2) a breach of the fiduciary duty to the plaintiff; and (3) injury to the plaintiff (or benefit to the defendant) as a result of the breach. *Jones v. Blume*, 196 S.W.3d 440, 447 (Tex. App.—Dallas 2006, pet. denied). In his second summary judgment motion, Hebert asserted that appellants lacked evidence of a duty and evidence of a breach. Appellants came forward with summary judgment evidence attempting to raise a genuine fact issue on these elements, but the trial court granted the motion.

The existence of a common law duty is a question of law. *Humble Sand & Gravel, Inc. v. Gomez*, 146 S.W.3d 170, 181 (Tex. 2004). In this case, Hebert's 2008 Agreement specifically identifies him as a fiduciary in terms of his access to proprietary information in his role as Managing Director of DFW. Moreover, the summary judgment evidence establishes that Hebert

---

[21] Because appellants have not challenged the Second Summary Judgment's dismissal of claims for misappropriation of trade secrets and harmful acts by computer, we affirm the trial court's summary judgment on those claims.

was both a member of the Board of Directors of DFW and Vice President of DFW, along with eight other related entities. It is well-settled that corporation officers and directors are fiduciaries. *Int'l Bankers Life Ins. Co. v. Holloway*, 368 S.W.2d 567, 576 (Tex. 1963). As such, officers and directors owe a duty to act only in the best interest of the corporation and its shareholders. *Hughes v. Houston Nw. Med. Ctr., Inc.*, 680 S.W.2d 838, 843 (Tex. App.—Houston [1st Dist.] 1984, writ ref'd n.r.e.). Specifically, a corporate fiduciary is under the obligation not to usurp corporate opportunities for personal gain. *Holloway*, 368 S.W.2d at 577. "If an agent, while employed by his principal, uses his position to gain a business opportunity belonging to the employer, such conduct constitutes an actionable wrong." *Abetter Trucking Co., Inc. v. Arizpe*, 113 S.W.3d 503, 510 (Tex. App.—Houston [1st Dist.] 2003, no pet.).[22]

Appellants offered summary judgment evidence that Hebert negotiated and signed the Hospital PSA, ostensibly providing him the opportunity—by resigning from his employment with DFW—to avoid the Noncompete. Appellants also offered summary judgment evidence that they took the position that the Hospital PSA was unauthorized and represented "an obvious conflict of interest," and that they terminated the Hospital PSA for those reasons. Hebert's own deposition testimony relates communications and meetings he had with representatives of ProPath while he was still employed by DFW. Hebert testified he intended to hold the same position of Medical Director at the Hospital, although he would now be working for ProPath. He also testified to informing ProPath of the contact information for his staff at DFW and of his understanding that those persons would be working for ProPath as well.

---

[22] We note that Hebert cites *Abetter Trucking* as authority for the propositions (1) that his resignation from DFW terminated any duty he had not to compete with DFW, and (2) that his actions taken before resignation were "permissible preparation to compete." However, the employee in *Abetter Trucking* had not signed a covenant not to compete as Hebert had. Indeed, the opinion states expressly: "An employer who wishes to restrict the post-employment competitive activities of a key employee may seek to accomplish that goal through a non-competition agreement." 113 S.W.3d at 510. This, of course, is precisely what appellants attempted to do in the Noncompete.

We conclude the summary judgment evidence establishes conclusively that Hebert owed fiduciary duties to appellants. We further conclude that appellants have raised material fact questions as to whether Hebert breached those duties, for example, in the process of negotiating his employment with ProPath, taking the business of the Hospital from appellants to ProPath, and enabling the move of other employees of appellants to ProPath's employ.[23] Accordingly, we conclude the trial court erred in granting summary judgment on appellants' counterclaim for breach of his fiduciary duties.

We reverse the trial court's judgment on appellants' claim for breach of fiduciary duty and remand that counterclaim for further proceedings.

### *Tortious Interference*

Appellants pleaded counterclaims against Hebert for tortious interference with their existing contract and prospective business relations with the Hospital. The elements of a claim for tortious interference with an existing contract are: (1) an existing contract subject to interference, (2) a willful and intentional act of interference with the contract, (3) that proximately caused the plaintiff's injury, and (4) caused actual damages or loss. *Prudential Ins. Co. of Am. v. Fin. Review Servs., Inc.*, 29 S.W.3d 74, 77 (Tex. 2000). "To establish liability for interference with a prospective contractual or business relation the plaintiff must prove that it was harmed by the defendant's conduct that was either independently tortious or unlawful." *Wal-Mart Stores, Inc. v. Sturges*, 52 S.W.3d 711, 713 (Tex. 2001). The supreme court explained that by "independently tortious," it meant conduct that would violate some other recognized tort duty. *Id.*

---

[23] We do not address Hebert's argument that his duties to his employer were "not paramount" because of purportedly higher duties to his patients. Hebert did not include that argument in his motion for summary judgment.

As a threshold matter, Hebert contended he was entitled to summary judgment on appellants' tortious interference with the existing contract claim because the Hospital PSA was terminable at will. Appellants responded, and repeat here, that the terminable-at-will status of a contract is no defense to a tortious interference cause of action. We agree. *See Sterner v. Marathon Oil Co.*, 767 S.W.2d 686, 688 (Tex. 1989) ("[A] cause of action exists for tortious interference with a contract of employment terminable at will."). Appellants complain, *inter alia*, of conduct that occurred before termination of the Hospital PSA; as to that conduct, appellants may urge a claim for tortious interference with an existing contract. *See id.* at 689 ("Until terminated, the contract is valid and subsisting, and third persons are not free to tortiously interfere with it.").

Hebert further contended he was entitled to summary judgment because (1) appellants had no evidence of interference by Hebert, and (2) appellants had caused their own damages by terminating the Hospital PSA. As to interference, we conclude the same conduct that raised material fact issues concerning a breach of fiduciary duties also raises fact issues here. Summary judgment evidence raises questions about Hebert's authority to contract for DFW in a self-dealing fashion, and that conduct took place while the Hospital PSA was in effect. There is also summary judgment evidence that Hebert intended to move the Hospital's business from appellants to ProPath after termination of the Hospital PSA. Because we have already concluded Hebert's conduct raised a material fact issue on the issue of breach of fiduciary duty, appellants have similarly raised a fact issue as to Hebert's conduct being independently tortious. *See Sturges*, 52 S.W.3d at 713. We conclude appellants raised a genuine issue of material fact on the issue of interference by Herbert for both causes of action.

Finally, Hebert urged that appellants could not recover "for damages it did to itself," relying on *Brown v. Lundell*, 344 S.W.2d 863, 92 (Tex. 1961). *See also Signal Oil & Gas Co. v.*

*Universal Oil Prods.,* 572 S.W.2d 320, 328 (Tex. 1978) (plaintiff cannot recover for damages proximately caused by his own negligence or fault).  Hebert cast this ground as a traditional summary judgment ground, rather than a no-evidence ground.  Hebert pointed to evidence that appellants terminated the Hospital PSA themselves.  However, he contends, in their claims for tortious interference they seek to recover the revenue that would have been earned from that agreement's continuation.  Appellants did not respond to this argument in any fashion in their response to the second motion.  It is settled that a summary judgment must stand or fall on its own merits.  *McConnell v. Southside Indep. Sch. Dist.*, 858 S.W.2d 337, 343 (Tex. 1993).  "If a non-movant fails to present any issues in its response or answer, the movant's right is not established and the movant must still establish its entitlement to summary judgment."  *Id.*  Appellants were free to challenge the legal insufficiency of this argument on appeal, *see id.*, but their brief in this Court presents no more than an unsupported statement that Hebert's argument is "meritless," that his interference resulted in (unspecified) damages to DFW, and that the evidence in the record raises a fact issue on each element of the claims.  Appellants cite no contrary legal authority.  And appellants have not identified any damages they have claimed that are not foreclosed by Hebert's legal authority.  We conclude appellants failed to establish that Hebert's damages argument was legally insufficient.

In the absence of a material fact issue on recoverable damages, we affirm the trial court's Second Summary Judgment on appellants' counterclaims for tortious interference with their existing contract and prospective business relations with the Hospital.

### *Civil Conspiracy*

Appellants pleaded a claim against Hebert and ProPath for civil conspiracy (a) to commit breach of fiduciary duty, (b) to misappropriate confidential and proprietary information, and (c) to interfere with DFW's business relationships.  The Second Summary Judgment included a

ruling in favor of ProPath on this claim, but appellants did not perfect an appeal of the judgment as to ProPath. "[A] civil conspiracy is a combination by *two or more persons* to accomplish an unlawful purpose or to accomplish a lawful purpose by unlawful means." *Firestone Steel Prods. Co. v. Barajas*, 927 S.W.2d 608, 614 (Tex. 1996) (emphasis added). As a matter of law, appellants cannot establish a conspiracy involving only Hebert. We affirm the trial court's Second Summary Judgment on appellants' counterclaim for civil conspiracy.

## Declaratory Judgments

Hebert's second summary judgment motion contended appellants could not prevail on the two declaratory judgments they sought below: (1) that the 2008 Agreement is valid, and (2) that Hebert is not a third party beneficiary of the Hospital PSA. Appellants have not challenged the dismissal of their declaratory judgment claims in this Court. Accordingly, we affirm the trial court's Second Summary Judgment on these counterclaims.

## Appellants' Attorney's Fees

Hebert also sought summary judgment on appellants' claims for attorney's fees. Appellants' claims were based on two provisions of the Texas Civil Practice and Remedies Code that allow recovery of fees in suits for breach of a written contract and suits for harmful access by computer. *See* TEX. CIV. PRAC. & REM. CODE. ANN. §§ 38.001(8), 143.002(2). The trial court granted summary judgment on these claims for attorney's fees, but appellants have not challenged that ruling in this Court. Accordingly, we affirm the trial court's judgment on appellants' counterclaims for attorneys' fees under these statutes.

We sustain appellants' third issue in part and overrule it in part.

## VII.
### HEBERT'S ATTORNEY'S FEES

In their fourth issue, appellants argue the trial court erred in granting attorney's fees to Hebert. As we explained above, Hebert proposed to the trial court and appellants that if he were granted his attorney's fees, he would move to sever his remaining tort claims, allowing a final judgment to be entered and allowing appellants to pursue their appeal. The trial court did award Hebert fees in the amount of $ 681,928.20. At appellants' request, the trial court issued Findings of Fact and Conclusions of Law, which asserted the fees were awarded pursuant to the Texas Civil Practice and Remedies Code (the Declaratory Judgment Act) and the Texas Business and Commerce Code (Procedures and Remedies in Actions to Enforce Covenants Not to Compete), both of the grounds on which Hebert had sought his fees.

Appellants contend the trial court's decision to hear evidence on and award fees when it did violated the parties' Rule 11 agreement. A trial court has a duty to enforce the terms of a valid Rule 11 agreement. *Fortis Benefits v. Cantu*, 234 S.W.3d 642, 651 (Tex. 2007). The parties agree on the words that make up their agreement, but not on what those words meant. Both point to the following statement, made on the record by counsel for Hebert:

> [O]ur view of what is left following your Honor's most recent ruling on the summary judgment is that there -- we have, essentially, three tort claims by Dr. Hebert, and then the issue of attorney's fees, which the parties have agreed would not -- *would be submitted to the Court after a trial, not during the trial.* (Emphasis added.)

There is no dispute that the agreement intended the trial court—rather than the jury—to determine the fee issue. But appellants argue the temporal element of the agreement was critical to them as well. Appellants contend their agreement was "to address the issue of attorneys' fees after a trial, not after a summary judgment ruling." Legally, we consider a summary judgment proceeding to be a trial within the meaning of the rules of civil procedure. *See Lincoln Prop. Co. v. Kondos*, 110 S.W.3d 712, 714 (Tex. App.—Dallas, 2003, no pet.). As to the circumstances

surrounding the trial court's decision, the parties were set for trial at the time the trial court heard the attorney's fee issue. However, the only issues remaining to be tried were Hebert's tort claims, for which no fees could be recovered. Moreover, once those tort claims were severed, no issues remained to be resolved. Thus, even if appellants understood their agreement to mean that attorney's fees would be the final determination made in the case, that was effectively what happened here. Appellants have not challenged the severance on appeal. Thus, we conclude any error in the timing of the trial court's decision to award fees was harmless.

Appellants also challenge the fee award substantively. And, as detailed above, appellants challenged the underlying bases for the award of fees. Appellants challenged Hebert's claim that the Noncompete was overly broad; we have ruled in appellants' favor on that issue as well. Accordingly, Hebert was not entitled to an award of attorney's fees under the statute that requires attempted enforcement of a covenant that "did not contain limitations as to time, geographical area, and scope of activity to be restrained that were reasonable." TEX. BUS. & COMM. CODE ANN. § 15.51(c).

Appellants also challenged—and we have reversed—Hebert's First Summary Judgment, which declared that Hebert was not subject to the Noncompete because ADFW, the employer named on the 2008 Agreement, did not exist. In a declaratory judgment action, a court "may award . . . reasonable and necessary attorney's fees as are equitable and just." TEX. CIV. PRAC. & REM. CODE ANN. § 37.009. Appellants argue here, *inter alia*, that an award of fees under this statute cannot be equitable and just given the evidence demonstrating Hebert violated his Noncompete. Whether an attorney's fee award is equitable and just is a question of law for the trial court to decide. *Ridge Oil Co., Inc. v. Guinn Inv., Inc.*, 148 S.W.3d 143, 161 (Tex. 2004). However, our opinion in this case significantly changes the trial court's final judgment, and we cannot discern whether the trial court would still consider its award of fees to be equitable and

just in light of those changes. *See State Farm Lloyds v. C.M.W.,* 53 S.W.3d 877, 894–95 (Tex. App.—Dallas 2001, pet. denied). Accordingly, we conclude the issue of attorney's fees must be reversed and remanded to the trial court for reconsideration following further proceedings. *See Wells Fargo Bank Nw., N.A. v. RPK Capital XVI, L.L.C.*, 360 S.W.3d 691, 712-13 (Tex. App.— Dallas 2012, no pet.).

We sustain appellants' fourth issue.

# VIII.
## PENDING MOTIONS

Hebert has filed a series of motions in this Court. We address those that remain pending.

### Appellee's Motion to Strike Supplemental Record Material

The record in this case is complex, containing documents filed with each of the two interlocutory appeals as well as the appeal from the final judgment in the case below. In this motion, Hebert asks us to strike the three volumes of supplemental clerk's record filed on June 12, 2012 (the "June 12 Record"). These volumes include documents filed in the case severed from the case appealed here. Specifically, the volumes include documents from appellants' efforts to recuse the trial judge in the severed cause. Appellants requested these items be placed in a supplemental record.

"If a relevant item has been omitted from the clerk's record, the trial court, the appellate court, or any party may by letter direct the trial court clerk to prepare, certify, and file in the appellate court a supplement containing the omitted item." TEX. R. APP. R. 34.5(c)(1). However, the caption and dates on these documents establish on their face that they were filed in the trial court (a) after the final judgment and notice of appeal in this cause, and (b) in the severed cause. We will not consider documents that were not properly part of the trial court's record in this cause. *See Mullins v. Mullins*, 202 S.W.3d 869, 873 (Tex. App.—Dallas 2006, pet. denied) (striking supplemental record including letters not included in trial court's record); *see*

*also In re E.W.*, No. 05-01-01463-CV, 2002 WL 1265541, at \*3 (Tex. App.—Dallas June 7, 2002, pet. denied) (not designated for publication) (rule does not "permit the clerk's record in an appeal to be supplemented unless it is clear that the item to be considered was on file when the trial court rendered judgment").

We grant Hebert's motion to strike in part. The June 12 Record includes documents that were on file with the trial court at the time of the severance at Volume 1, pages 1 through 100, and pages 103 and 104. These documents will remain in the record for this appeal. The remainder of the June 12 record is stricken.

### Appellee's Motion to Dismiss Appeal

Hebert filed a motion seeking to dismiss appellants' interlocutory appeal of the trial court's order denying confirmation of the arbitration award. That interlocutory appeal has now been consolidated into the appeal from the final judgment in this case, rendering the motion to dismiss the interlocutory appeal moot. We overrule Appellee's Motion to Dismiss Appeal.

### Appellee's Motion to Dismiss Second Appeal

Hebert also filed a motion to dismiss appellants' interlocutory appeal of the modification of the agreed temporary injunction. As noted above, the trial court's final judgment rendered the interlocutory appeal of the temporary injunction moot. *See Isuani*, 802 S.W.2d at 236. We overrule Appellee's Motion to Dismiss Second Appeal as moot.

### Appellants' Objection to Post-Argument Briefing

By letter dated October 16, 2013, counsel for appellants objected to supplemental briefing offered by Hebert's counsel after oral argument of this case. The Court does not generally consider post-argument briefing that it has not requested unless that briefing is to identify relevant opinions decided after the date of submission. We follow that procedure in this case.

# IX.
## CONCLUSION

We affirm the trial court's judgment in part and reverse in part. We affirm the trial court's judgment in favor of Hebert on the following counterclaims pleaded by appellants:

- breach of oral agreements made during litigation,

- misappropriation of trade secrets,

- harmful acts by computer,

- tortious interference with existing contract and prospective business relations,

- civil conspiracy,

- attorney's fees, and

- declaratory judgment.

In all other respects, we reverse the trial court's judgment and remand this case for further proceedings consistent with this opinion.

/David Lewis/
DAVID LEWIS
JUSTICE

120321F.P05



# Court of Appeals
# Fifth District of Texas at Dallas

## JUDGMENT

AMERIPATH, INC. AND DFW 5.01(A) CORPORATION, Appellant

No. 05-12-00321-CV     V.

STEVEN HEBERT, Appellee

On Appeal from the 199th Judicial District Court, Collin County, Texas
Trial Court Cause No. 199-03680-2009.
Opinion delivered by Justice Lewis, Justices Bridges and Fillmore participating.

In accordance with this Court's opinion of this date, the judgment of the trial court is **AFFIRMED** in part and **REVERSED** in part.

We **AFFIRM** the trial court's judgment in favor of Steven Hebert on the following counterclaims pleaded by AmeriPath Inc. and DFW 5.01(a) Corporation:

- breach of oral agreements made during litigation,

- misappropriation of trade secrets,

- harmful acts by computer,

- tortious interference with existing contract and prospective business relations,

- civil conspiracy,

- attorney's fees, and

- declaratory judgment.

In all other respects, we **REVERSE** the trial court's judgment and **REMAND** this case for further proceedings consistent with this opinion.

It is **ORDERED** that each party bear its own costs of this appeal.

Judgment entered this 5th day of August, 2014.