FILED IN
BUSINESS COURT OF TEXAS
BEVERLY CRUMLEY, CLERK
ENTERED
3/12/2026

2026 Tex. Bus. 12



THE BUSINESS COURT OF TEXAS
EIGHTH DIVISION

| | | |
|---|---|---|
| GALDERMA LABORATORIES, L.P. | § | |
| | § | |
| *Plaintiff,* | § | |
| | § | |
| v. | § | Cause No. 26-BC08B-0003 |
| | § | |
| ERICK BRENNER, | § | |
| | § | |
| *Defendant.* | § | |
| | § | |

## MEMORANDUM OPINION AND ORDER GRANTING IN PART PLAINTIFF'S APPLICATION FOR TEMPORARY INJUNCTION

### INTRODUCTION

¶ 1.   Before the Court is Plaintiff Galderma Laboratories, L.P.'s ("Galderma") Application for Temporary Injunction ("Application") against Defendant Erick Brenner ("Brenner").

¶ 2.   The Court conducted an evidentiary hearing on February 23, 2026. Having considered the pleadings, briefing, evidence, arguments of counsel, and applicable law, the Court concludes that Galderma has met its burden to obtain

temporary injunctive relief to the extent set forth in this Order. Absent such relief, Galderma faces a probable, imminent, and irreparable injury for which there is no adequate remedy at law. An injunction is therefore necessary to preserve the status quo pending trial.

¶ 3.    This Order does not constitute a final adjudication of the parties' claims or defenses. At this stage, the Court's role is limited to determining whether interim relief is warranted to preserve the subject matter of the litigation until a full trial on the merits can occur.

## GOVERNING STANDARD

¶ 4.    A temporary injunction is an extraordinary remedy designed to preserve the status quo until the rights of the parties can be determined at trial.[1] To obtain a temporary injunction, an applicant must establish: (a) a viable cause of action; (b) a probable right to the relief sought; and (c) a probable, imminent, and irreparable injury in the interim.[2]

¶ 5.    A probable right to relief requires a showing that the applicant has standing and is likely to succeed on the merits.[3] A probable, imminent, and

---

[1] *Harley Channelview Props., LLC v. Harley Marine Gulf, LLC*, 690 S.W.3d 32, 37 (Tex. 2024).
[2] *Butnaru v. Ford Motor Co.*, 84 S.W.3d 198, 204 (Tex. 2002).
[3] *Abbott v. Anti-Defamation League Austin, Sw., & Texoma Regions*, 610 S.W.3d 911, 917 (Tex. 2020) (per curiam); *see Walling v. Metcalfe*, 863 S.W.2d 56, 58 (Tex. 1993) (per curiam).

irreparable injury is one for which damages would be inadequate or incapable of precise calculation.[4]

¶ 6.   Texas Rule of Civil Procedure 683 requires an injunction order to (a) state the reasons for its issuance, (b) be specific in terms, and (c) describe in reasonable detail the acts restrained.[5] "It is not required that the trial court explain its reasons for believing that the applicant has shown a probable right to final relief, but it is necessary to give the reasons why injury will be suffered if the interlocutory relief is not ordered."[6]

## FACTUAL BACKGROUND

**A.   The Protective Covenants Agreement.**

¶ 7.   Brenner was a longtime Galderma employee and executive. On June 7, 2024, he executed a Protective Covenants Agreement ("Agreement" or "PCA") with Galderma. A true and correct copy of the Agreement is attached as Exhibit A and incorporated herein by reference. The Agreement recites that it is supported by valuable consideration, including Brenner's continued employment, access to Galderma's Confidential Information, and an award under Galderma's Long-Term Incentive Plan.[7]

---

[4] *Butnaru*, 84 S.W.3d at 204.
[5] TEX. R. CIV. P. 683.
[6] *State v. Cook United, Inc.*, 464 S.W.2d 105, 106 (Tex. 1971).
[7] PCA at 1.

¶ 8.   The Agreement imposes several post-employment restrictions that last twelve months from Brenner's termination date of November 19, 2025. These restrictions include:

a)   a "Noncompete" covenant prohibiting Brenner from providing services to any "Competitor" in any role involving "Competitive Activity" within or related to the "Restricted Area," as those terms are defined in the Agreement;[8]

b)   a "Customer Nonsolicit" covenant prohibiting Brenner from soliciting "Covered Customers" for the purpose of providing "Competing Products or Services";[9]

c)   a "Worker Nonsolicit" covenant prohibiting Brenner from soliciting "Covered Workers" to leave Galderma;[10] and

d)   a "Confidentiality" covenant prohibiting the unauthorized use or disclosure of Galderma's "Confidential Information."[11]

¶ 9.   In the Agreement itself, Brenner acknowledged that his "skills, education, and/or experience are such that [his] compliance with the restrictions provided for in this Agreement during and after [his] employment will not place an unreasonable burden on [him] or prevent [him] from earning a living."[12] He further agreed that the restrictions were "narrowly tailored to protect the Company's trade secrets and other legitimate protectable interests."[13]

---

[8] *Id.* § 4.1.
[9] *Id.* § 4.2.
[10] *Id.* § 4.3.
[11] *Id.* § 3.
[12] *Id.* § 1.
[13] *Id.*

¶ 10. The Agreement also addresses the harm that would result from a breach. Brenner agreed that certain activities would, "by their nature and irrespective of [his] intent, involve conversion of Company trade secrets and other Business Investments to the unfair advantage of competitors if engaged in shortly after [his] employment ends."[14] The Agreement acknowledges that any violation "would likely cause not only actual and compensable damage, but also irreparable harm and continuing injury to the Company for which there would not be an adequate remedy at law."[15]

¶ 11. On July 14, 2025, Galderma issued a Notice of Clarification and Addition to the Agreement pursuant to PCA § 10, which clarified the definition of "Covered Worker" and added a Survival and Severability provision. Brenner continued his employment thereafter and, under the terms of the Clarification, thereby accepted its provisions.

¶ 12. Following the end of his employment, Brenner executed a Separation Agreement and Release on November 25, 2025. The Separation Agreement expressly provides that the PCA, including the Clarification, remains in effect.

**B. Brenner's role at Galderma.**

---

[14] *Id.* § 4.
[15] *Id.* § 6.

¶ 13. Brenner served as General Manager of Galderma's Injectable Aesthetics Division and later as ad interim Head of the United States. In those roles, he oversaw a $1.8-billion portfolio encompassing injectable aesthetics, dermatologic skincare, and therapeutic dermatology. Because of those responsibilities, Brenner had extensive access to Galderma's trade secrets and confidential information, including pricing and contract terms, go-to-market strategies, customer information, sales and marketing strategies, personnel and organization data, loyalty program data (ASPIRE), and training program data (GAIN).

¶ 14. During the two-year Look Back Period preceding his termination, Brenner was materially involved with—and had access to confidential information concerning—Galderma's Injectable Aesthetics business, including the hyaluronic acid dermal filler segment.

## C. Brenner's pre-departure access to Confidential Information.

¶ 15. In September 2025, Galderma informed Brenner that his employment would soon be ending. The parties dispute the circumstances surrounding that decision, but there is at least some evidence that Galderma sought to avoid paying Brenner a $3-million bonus due in 2027.

¶ 16. Brenner was advised that his access to Galderma's computer systems would be revoked on or around September 19, 2025. On September 18 and 19, 2025,

Brenner accessed a number of Galderma files, including materials relating to sales strategy, brand planning, pricing agreements, sales and operations plans, organizational charts, customer segmentation data, and GAIN-related materials. Brenner testified he accessed these materials to assist a colleague who would be assuming expanded responsibilities after Brenner's departure. Brenner produced email and text messages indicating at least some of the materials were in fact shared with that colleague during this period.

¶ 17.  On September 19, 2025 at 8:34 a.m., Brenner connected an external Kingston DataTraveler 3.0 USB storage device to his Galderma-issued laptop. The device remained connected until September 22, 2025 at 10:31 a.m. During this time, Brenner accessed multiple Galderma files and folders within the OneDrive directory. Brenner testified he used the device only to download personal information and did not transfer Galderma information to it. Galderma's forensic expert acknowledged that the available evidence is inconclusive as to whether any work files were transferred to the device.

¶ 18.  Brenner's system access was revoked on September 23, 2025.

**D.     Brenner's employment with Prollenium.**

¶ 19. Prollenium Medical Technologies ("Prollenium") is a Canadian company that competes directly with Galderma in the injectable aesthetics market. Prollenium develops and markets hyaluronic acid dermal fillers—including

Revanesse Lips and Revanesse Versa—that compete in the United States market with Galderma's Restylane product line.

¶ 20.  In December 2025, Brenner asked Galderma for permission to accept a position on Prollenium's Board of Directors and to pursue executive roles with other competitors in the aesthetics market. On December 10, 2025, Galderma denied the request and notified Brenner in writing that any executive role with Prollenium would violate the PCA.

¶ 21.  Despite Galderma's objection, Brenner accepted the position of Chief Executive Officer at Prollenium. On January 26, 2026, Prollenium officially announced his appointment, effective immediately.

¶ 22.  The parties dispute the nature of the guidance that Galderma provided Brenner regarding whether he could accept employment with Prollenium. Brenner testified that, before accepting the position, a Galderma human resources representative indicated that the opportunity with Prollenium would be permitted. The record also reflects that, following the public announcement of his appointment, certain Galderma employees and executives offered congratulatory messages. Galderma nevertheless maintains that it advised Brenner before he accepted the CEO position that doing so would violate the PCA.

**ANALYSIS**

¶ 23.  Having set forth the relevant facts, the Court now turns to whether

Galderma has satisfied its burden for temporary injunctive relief. Specifically, the Court considers whether Galderma has demonstrated (a) a probable right to recovery and (b) a probable, imminent, and irreparable injury in the absence of an injunction.

## A. Probable right of recovery.

¶ 24. Galderma asserts claims for breach of contract and violation of the Texas Uniform Trade Secrets Act ("TUTSA").

¶ 25. With respect to breach of contract, the Court concludes that Galderma has demonstrated a probable right to recovery as to Section 4.1 of the PCA, the Noncompete covenant. On the present record, the PCA is likely enforceable under Section 15.50 of the Texas Business and Commerce Code because it was ancillary to an otherwise enforceable agreement and contains reasonable limitations as to time, geographic scope, and activity.[16] Brenner's acceptance of the Chief Executive Officer position at Prollenium—a direct competitor in the same product segment in which he previously exercised senior executive authority at Galderma—falls within the scope of activity prohibited by Section 4.1 during the restricted period.

¶ 26. The Court reaches a different conclusion with respect to the remaining covenants. As to Sections 4.2 (Customer Nonsolicit) and 4.3 (Worker Nonsolicit),

---

[16] The Court notes that certain aspects of the Noncompete covenant require limited reformation to ensure that—as applied here—its limitations as to geographic scope are reasonable under Texas law. Those modifications are addressed later in this opinion. *See* Tex. Bus. & Com. Code § 15.51(c).

Galderma presented no evidence that Brenner has solicited, attempted to solicit, or assisted in the solicitation of any Covered Customer or Covered Worker, as those terms are defined in the PCA. Nor did Galderma present evidence of any specific threatened solicitation. On this record, the Court cannot conclude that Galderma has established a probable right of recovery for breach of Sections 4.2 or 4.3.

¶ 27.  Similarly, with respect to Section 3 (Confidentiality), the evidence does not establish that Brenner has used or disclosed Galderma's Confidential Information in violation of the Agreement. Although Brenner accessed company files in the days preceding the termination of his system access, Galderma's own forensic evidence was inconclusive as to whether any files were downloaded or transferred to external media. Brenner testified that he accessed the materials to assist a colleague who would assume expanded responsibilities after his departure, and the record contains some documentary evidence supporting that explanation. On this record, the Court cannot find that Galderma has demonstrated a probable right of recovery for breach of the Confidentiality covenant. Mere suspicion or apprehension of a possible breach is insufficient; injunctive relief requires evidence establishing a probable violation.[17]

¶ 28.  For similar reasons, Galderma has not established a probable right to

---

[17] *Jones v. Jefferson Cnty.*, 15 S.W.3d 206, 213 (Tex. App.—Texarkana 2000, pet. denied); *Hyde v. Aero Valley Prop. Owners Ass'n*, No. 02-20-00416-CV, 2021 WL 2460799, at *9 (Tex. App.—Fort Worth June 17, 2021, no pet.) (mem. op.).

recovery under TUTSA at this stage. While the evidence shows that Brenner had access to sensitive and competitively valuable information during his employment, past access alone does not establish actual or threatened misappropriation.[18] The forensic evidence presented does not convincingly show that Brenner currently possesses trade secrets or that such information was copied, transferred, disclosed, or used, and the Court declines to infer misappropriation solely from Brenner's subsequent employment with a competitor. This sort of supposition is how reputations are ruined in an industry.

¶ 29. Accordingly, the Court finds that Galderma has demonstrated a probable right of recovery only as to its claim that Brenner's employment with Prollenium violates the Noncompete covenant in Section 4.1 of the PCA. Galderma has not met its burden, on the present record, to establish a probable right of recovery under Sections 3, 4.2, or 4.3 of the Agreement or under TUTSA. Any injunctive relief must therefore be confined to enforcing Section 4.1.

## B.     Probable, imminent, and irreparable harm.

¶ 30. The Court finds that Galderma will suffer a probable, imminent, and irreparable injury absent temporary injunctive relief. Brenner currently serves as

---

[18] *See Fox v. Tropical Warehouses, Inc.*, 121 S.W.3d 853, 860 (Tex. App.—Fort Worth 2003, no pet.) (explaining that for trade secret protection, employer needs to prove ex-employee possesses employer's confidential information and is in a position to use it); *W.R. Grace & Co.-Conn. v. Posey*, No. 03-07-00184-CV, 2007 WL 2462003, at *5 (Tex. App.—Austin Aug. 30, 2007, no pet.) (mem. op.) (upholding denial of temporary injunction after employee testified he returned or destroyed all company information and employer failed to provide evidence of actual use or disclosure of confidential information).

Chief Executive Officer of a direct competitor in the same narrowly defined market for hyaluronic acid dermal fillers in which he most recently exercised senior executive authority. His continued service in that role presents a substantial and ongoing risk that Galderma's competitively sensitive information will inform Prollenium's strategic decision-making.

¶ 31. At the chief executive level, competitive decision-making is continuous and enterprise-wide. Strategic decisions regarding pricing, product positioning, sales structure, marketing initiatives, and long-term growth planning occur constantly and shape competitive outcomes in real time. Brenner's knowledge of Galderma's strategy in these areas is recent and detailed. The risk of competitive harm does not depend on proof of intentional misuse. Rather, it arises from the practical difficulty—if not impossibility—of compartmentalizing confidential information while leading a competitor in the same market segment.

¶ 32. The threatened harm is imminent. Brenner has already commenced employment with Prollenium following the public announcement of his appointment on January 26, 2026. Each day he serves in that capacity presents the potential for competitive decisions that may be influenced—consciously or unconsciously—by his knowledge of Galderma's strategies and business plans.

¶ 33. The harm is also irreparable. Loss of trade secrets, erosion of goodwill, disruption of customer and employee relationships, and competitive disadvantage

cannot be fully measured or compensated by monetary damages.[19] Once confidential information informs competitive strategy, it cannot be "unlearned," and its marketplace impact cannot be precisely quantified or undone.[20] Even a single strategic disclosure could have lasting competitive consequences that monetary damages cannot adequately remedy.

¶ 34.  The parties themselves acknowledged in the PCA that a breach of the restrictive covenants would likely result in irreparable harm for which there would be no adequate remedy at law. While such contractual language is not controlling, it reinforces the Court's independent determination that legal remedies would be inadequate under these circumstances.

C.    **Scope of injunctive relief.**

¶ 35. Having determined that injunctive relief is warranted as to the Noncompete covenant in Section 4.1, the Court must decide the appropriate scope of that relief. Under Section 15.50(a) of the Texas Business and Commerce Code, a covenant not to compete must contain reasonable limitations as to time, geographic

---

[19] *See Tex. Dep't of State Health Servs. v. Holmes*, 294 S.W.3d 328, 334 (Tex. App.—Austin 2009, pet. denied) ("Irreparable harm for purposes of a temporary injunction may include noncompensable injuries such as a 'company's loss of goodwill, clientele, marketing techniques, office stability and the like.'") (quoting *Graham v. Mary Kay, Inc.,* 25 S.W.3d 749, 753 (Tex. App.—Houston [14th Dist.] 2000, pet. denied))).

[20] *See Mabrey v. SandStream, Inc.*, 124 S.W.3d 302, 319 (Tex. App.—Fort Worth 2003, no pet.) ("Irreparable harm may be established by evidence that disclosure of confidential information could enable competitors to mimic the marketing plans and strategies of the applicant and avoid the less successful strategies . . . .").

area, and scope of activity and may not impose a greater restraint than necessary to protect the employer's legitimate business interests.[21]

### 1.    Duration of the noncompete clause

¶ 36.   The Court first addresses the duration of the noncompete clause. The PCA restricts competitive activity for a period of twelve months following termination of employment. On the present record, that one-year duration is reasonable. It is limited in time and is commensurate with the pace at which competitive strategy, pricing models, and product initiatives evolve in the injectable aesthetics market. A twelve-month restriction is sufficient to protect Galderma's legitimate interests without unduly burdening Brenner's ability to resume competitive employment once the restricted period expires.[22]

### 2.    Scope of the noncompete clause

¶ 37.   The Court likewise finds that the scope of activity restricted by Section 4.1 is reasonable as applied to the present dispute. The covenant does not preclude Brenner from working in the healthcare, pharmaceutical, dermatology, or medical-device industries generally. Nor does it prohibit him from serving in executive management across the broader life sciences sector. Instead, in the circumstances presented here, it restricts only "Competitive Activity" within the U.S. market for

---

[21] TEX. BUS. & COM. CODE § 15.50(a).
[22] *See Spend Life Wiseley Co. v. Phillips*, 700 F. Supp. 3d 510, 530 (E.D. Tex. 2023) (collecting Texas cases finding noncompete time restrictions of two to five years reasonable).

hyaluronic acid dermal fillers—a defined, product-specific segment in which Brenner most recently exercised senior executive authority and accessed competitively sensitive information.

¶ 38. In the context of Brenner's current position at Prollenium, the covenant therefore operates narrowly. The evidence presented at the hearing shows that Prollenium presently competes with Galderma in the U.S. only in the market for hyaluronic acid dermal fillers. Brenner's role as Chief Executive Officer of that company thus falls squarely within the competitive activity the covenant is designed to restrict. This limitation is therefore closely tied to Galderma's protectable interests and does not operate as an industry-wide exclusion.[23]

¶ 39. The Court recognizes that certain definitional provisions in the PCA could, in other circumstances, sweep more broadly than the hyaluronic acid dermal filler market at issue here. For example, "Competitive Activity" includes a catch-all for "other activity that is likely to result in the use or disclosure of Confidential Information for the benefit of a Competitor."[24] If interpreted to restrict activities beyond the competitive risks presented in this case, the covenant could extend further than necessary to protect Galderma's legitimate business interests. In that

---

[23] *See, e.g., M-I LLC v. Stelly*, 733 F. Supp. 2d 759, 796–99 (S.D. Tex. 2010) (applying Texas law and concluding that restriction limited to oilfield displacement tools/services was not an industry-wide ban); *Daily Instruments Corp. v. Heidt*, 998 F. Supp. 2d 553, 568 (S.D. Tex. 2014) (applying Texas law and concluding that restriction limited to narrow field of reactor thermometry products—and not refining, petrochemical, and chemical industries as a whole—was reasonable).
[24] PCA § 4.4(c).

event, Section 15.51(c) of the Texas Business and Commerce Code would require the Court to reform the definition of "Competitive Activity" to ensure that the restriction remained reasonable in scope.

¶ 40. That circumstance is not presented here. The evidence shows that Prollenium currently competes with Galderma only in the U.S. market for hyaluronic acid dermal fillers. The Court therefore does not construe the catch-all provision as presently applicable. Under the facts, the covenant operates narrowly, and no reformation of the activity restriction is required.

### 3. Geographic reach of the noncompete clause

¶ 41. With duration and activity scope addressed, the Court turns to geography. In assessing geographic reasonableness, Texas courts often look to the territory in which the employee actually worked.[25] That principle is not rigid, however.[26] The permissible breadth of a geographic restriction depends on the nature of the employer's business and the extent of the employee's involvement in that business.[27] Where an employee occupies a senior executive role, broader geographic restrictions may be justified because the employee's knowledge and influence extend beyond a single office location or customer base.[28]

---

[25] *AmeriPath, Inc. v. Hebert*, 447 S.W.3d 319, 335 (Tex. App.—Dallas 2014, pet. denied).

[26] *See id.*

[27] *Id.*; *McKissock, LLC v. Martin*, 267 F. Supp. 3d 841, 856 (W.D. Tex. 2016) (quoting *Butler v. Arrow Mirror & Glass, Inc.*, 51 S.W.3d 787, 793 (Tex. App.—Houston [1st Dist.] 2001, no pet.)); *Spend Life Wiseley* , 700 F. Supp. 3d at 528.

[28] *Gehrke v. Merritt Hawkins & Assocs.*, No. 05-18-01160-CV, 2020 WL 400175, at *4 (Tex. App.—Dallas 2020, pet. denied) (mem. op.); *Spend Life Wiseley*, 700 F. Supp. 3d at 528–29; *Providence Title Co. v. Truly*

¶ 42. This case involves precisely that type of senior executive. Brenner served as General Manager of Galderma's Injectable Aesthetics Division and later as ad interim Head of the United States, overseeing a $1.8-billion portfolio of products. His responsibilities were national in scope. The evidence reflects that he participated in nationwide pricing strategy, brand positioning, sales architecture, loyalty program design, and long-term growth planning for the U.S. market. His "territory," in any meaningful sense, was coextensive with the national injectable aesthetics market in which Galderma competes.

¶ 43. Courts applying Section 15.50 have upheld nationwide restraints where the employer's business was national in character and the employee's responsibilities were commensurate in scope.[29] In *M-I LLC v. Stelly*, for example, the court upheld a restriction spanning the Americas where the executive's actual territory and responsibilities extended throughout that region.[30] Similarly, in *Accruent, LLC v. Short*, the court upheld a noncompete covering every state and country in which a company did business where a high-level employee possessed

*Title, Inc.*, 547 F. Supp. 3d 585, 602–03 (E.D. Tex. 2021), *aff'd sub nom. Providence Title Co. v. Fleming*, No. 21-40578, 2023 WL 316138 (5th Cir. Jan. 19, 2023); *see Curtis v. Ziff Energy Grp., Ltd.*, 12 S.W.3d 114, 119 (Tex. App.—Houston [14th Dist.] 1999, no pet.).

[29] *Vais Arms, Inc. v. Vais*, 383 F.3d 287, 296 n.20 (5th Cir. 2004); *McKissock*, 267 F. Supp. 3d at 856–57 (upholding nationwide restriction for upper-level instructor with national customer base); *see also Daily Instruments Corp.*, 998 F. Supp. 2d at 567–68 (finding restriction against high-level sales manager limiting competition in U.S. and any country where company does business reasonable when he had "direct sales responsibilities for large portions of the United States and Canada, for all of Europe, and all of Russia" and access to company's confidential information regarding clients and sales worldwide).

[30] 733 F. Supp. 2d at 795, 797–98.

intimate knowledge of product functionality, development roadmaps, customer preferences, and strategic plans.[31] These decisions reflect that a geographic limitation is reasonable when it aligns with the employee's actual authority and the employer's protectable interests, even if it extends beyond a narrow local footprint. This principle applies with particular force where, as here, the employee now serves as CEO of a direct competitor operating in the same product segment.

¶ 44. At the same time, a noncompete may not extend beyond what is reasonably necessary to protect legitimate business interests.[32] Galderma seeks a global restriction and, to that end, presented evidence that Brenner periodically attended global forums where regional leaders discussed pricing, marketing, portfolio opportunities, and best practices. For one year, he also served as the U.S. representative in meetings with leaders from other global regions to discuss sales, pricing, and resource allocation. This evidence shows exposure to global initiatives and cross-regional discussions. It does not establish, however, that Brenner possessed operational authority or managerial responsibility for markets outside the U.S., or that he directed competitive strategy in those regions. On this record, a worldwide restriction would exceed what is necessary to preserve the status quo. A

---

[31] No. 1:17-CV-858-RP, 2018 WL 297614, at *4–5 (W.D. Tex. Jan. 4, 2018).
[32] TEX. BUS. & COM. CODE § 15.50(a).

limitation confined to the U.S. market more accurately reflects the scope of his authority and Galderma's protectable interests.

4. Statutory reformation under Section 15.51.

¶ 45. Section 15.51(c) of the Texas Business and Commerce Code provides that if a covenant not to compete contains limitations that are not reasonable as to time, geographic area, or scope of activity, "the court shall reform the covenant to the extent necessary to cause the limitations . . . to be reasonable and to impose a restraint that is not greater than necessary to protect the goodwill or other business interest of the promisee . . . ."[33] Where a covenant is overbroad, the Court must narrow it rather than invalidate it.

¶ 46. Although the Court has determined that the covenant's twelve-month duration and its application to the injectable aesthetics market are reasonable, certain definitional language within the PCA renders the covenant broader than necessary in two respects. The Court's task under Section 15.51(c) is therefore to tailor the covenant so that it protects Galderma's legitimate interests without imposing a restraint broader than necessary.

¶ 47. First, the definition of "Competitive Activity" includes "owning, operating, or managing a business that is a Competitor."[34] As drafted, this language

---

[33] *Id.* § 15.51(c).
[34] PCA § 4.4(c).

is not confined to roles that are the same as or substantially similar to the functions Brenner performed at Galderma. Read literally, it could prohibit Brenner from serving in any managerial capacity for any entity that qualifies as a "Competitor," regardless of whether the role implicates the same duties, authority, or competitive risk. Texas law does not permit a noncompete that bars employment with a competitor in any capacity.[35] Reformation is therefore necessary to limit the restriction to services that are the same as or substantially similar to those Brenner performed during the Look Back Period within the relevant market.

¶ 48. Second, the definition of "Restricted Area" includes territories in which Galderma "does business" that Brenner either had "material involvement with" or was "provided Confidential Information about" during the Look Back Period, so long as the Company continues to operate there. Including territories about which Brenner merely received confidential information expands the geographic scope beyond the areas for which he had responsibility or operational authority. The evidence shows that, as a senior executive, Brenner was exposed to confidential information concerning many aspects of Galderma's business with which he had no direct involvement. Tying the geographic restriction to every

---

[35] *See, e.g., Accruent*, 2018 WL 297614, at *6–7 (reforming noncompete that would have prohibited employment with a competitor "in any capacity" and limiting restriction to roles "substantially similar" to those previously performed); *see also* TEX. BUS. & COM. CODE § 15.51(c); *Wright v. Sport Supply Grp., Inc.*, 137 S.W.3d 289, 298 (Tex. App.—Beaumont 2004, no pet.) (citing *Peat Marwick Main & Co. v. Haass*, 818 S.W.2d 381, 386–87 (Tex. 1991)) ("A restrictive covenant is unreasonable unless it bears some relation to the activities of the employee.").

market about which he received information would therefore extend the covenant beyond what is reasonably necessary to protect Galderma's legitimate business interests.[36]

¶ 49. Pursuant to Section 15.51(c), the Court reforms the PCA as follows:

(a)  the phrase "owning, operating, or managing a business that is a Competitor" is removed from the definition of "Competitive Activity"; and

(b)  the phrase "or I am provided Confidential Information about in the Look Back Period to the extent the Company continues to do business therein" is removed from the definition of "Restricted Area."

¶ 50. As reformed pursuant to Section 15.51(c), Section 4.1 prohibits Brenner, for a period of twelve months following termination, from providing services to a competitor in a role that is the same as or substantially similar to the roles he performed during the Look Back Period within the United States market for hyaluronic acid dermal fillers. The injunction issued below enforces the covenant only as so reformed.

## D.    Balance of equities and public interest.

¶ 51. The balance of equities favors issuance of a temporary injunction. Brenner voluntarily executed the Protective Covenants Agreement, acknowledged its reasonableness, and received consideration in exchange for his obligations.

---

[36] *See* TEX. BUS. & COM. CODE § 15.51(c); *Accruent*, 2018 WL 297614, at *7 (reforming noncompete to remove the phrase "or received Proprietary Information," so that the noncompete would be limited to those portions of the former employer's business in which the employee "actively participated" ).

During his tenure at Galderma, he also enforced similar agreements against others. Brenner later reaffirmed these same obligations in his Separation Agreement in exchange for severance benefits. Requiring him to comply with those bargained-for restrictions for the limited period preceding trial does not impose an undue hardship.

¶ 52. By contrast, denial of injunctive relief would expose Galderma to risks that cannot later be fully remedied. The threatened injury to Galderma far outweighs the temporary restrictions imposed on Brenner.

¶ 53. The issuance of temporary relief also serves the public interest. Texas law recognizes the enforceability of reasonable covenants not to compete and authorizes injunctive relief to prevent the misuse of trade secrets. Enforcing valid contractual obligations and protecting confidential business information promote commercial certainty and fair competition.

## INJUNCTIVE RELIEF

¶ 54. **IT IS THEREFORE ORDERED** that Defendant Erick Brenner and his agents, servants, employees, attorneys, and all persons in active concert or participation with him who receive actual notice of this order, are temporarily **ENJOINED**, pending final trial on the merits, from directly or indirectly:

> **providing services to Prollenium Medical Technologies, or to any other Competitor, in the United States market for hyaluronic acid dermal fillers in a role that is the same as or substantially similar to the roles he performed for Galderma during the Look Back Period, in violation of Section 4.1 of the Protective Covenants Agreement as reformed by this Order.**

**This restriction applies only to competitive activity in the United States market for hyaluronic acid dermal fillers. Nothing in this Order prohibits Brenner from working for Prollenium Medical Technologies in any capacity that does not involve such competitive activity.**

¶ 55. It is further **ORDERED** that, within five (5) business days of this Order, Brenner shall (a) return to Galderma all property belonging to Galderma, including all company records, Confidential Information (as defined in the Agreement), and trade secrets, whether in hard copy or electronic form, that are within his possession, custody, or control, and (b) provide to Galderma a sworn written verification confirming that he has not retained any such materials in any form or disclosed such materials to any third party.

¶ 56. It is further **ORDERED** that Brenner shall preserve, in their current state, all documents, electronic files, communications (including email, text messages, and social media messages), and other information that is relevant or potentially relevant to any claim or defense in this action. Brenner shall not destroy, alter, conceal, transfer, or otherwise spoliate any such information.

¶ 57. It is further **ORDERED** that this case is set for trial on **January 11, 2027 at 9:00 a.m.** in the Business Court of Texas, Eighth Division. The parties shall submit a proposed scheduling order within thirty (30) days of this Order in accordance with Business Court Local Rule 4 and the Judge Specific Requirements of Judge Stagner.

¶ 58.  It is further **ORDERED** that, pursuant to Texas Rule of Civil Procedure 684, Galderma shall post a bond in the amount of $150,000 into the registry of the Court. The Court finds this amount is sufficient to secure payment of damages, if any, sustained by Brenner in the event this injunction is later determined to have been wrongfully issued. The temporary injunction shall become effective upon the posting of the bond.

¶ 59.  This Order remains in effect until further order of the Court or entry of final judgment.

SO ORDERED.

BRIAN STAGNER
Judge of the Texas Business Court
Eighth Division

Dated:  March 12, 2026 at 3:30 p.m.

# EXHIBIT A

**Protective Covenants Agreement**

This Protective Covenants Agreement ("Agreement") is made between the individual identified in the signature block below as the Employee ("Employee", "I" or "me") and the subsidiary or affiliated company of Galderma Holding AG with which I am employed ("Galderma") for the benefit of Galderma and any Affiliate (defined below) that I become employed with or perform services for or that otherwise has a protectable interest covered by this Agreement (the "Company"), collectively the "Parties."

In exchange for good and valuable consideration that includes my employment or continued employment, access to a portion of the Company's Confidential Information (defined below), an award provided to me under the Galderma Long-Term Incentive Plan, and such other consideration as may be provided for in this Agreement or provided to me as consequence of this Agreement, the sufficiency of which I acknowledge, and ***subject to any state-specific modification under Section 14 that may apply to me (if any) based upon my Controlling State*** (defined below), the Parties agree as follows:

1.        Protected Interests.   I acknowledge that the Company has spent and will continue to spend substantial time, resources, and money developing its trade secrets and other Confidential Information, technologies, products and services, training programs, and key business relationships ("Business Investments").  I recognize that these Business Investments are an important and valuable asset to the Company and give it a critical competitive advantage.  As a result of my employment position, and in reliance upon my promises in this Agreement, I will receive the benefit of, and access to a portion of the Company's Business Investments that could be used by me to gain an unfair competitive advantage against the Company and cause it irreparable harm if my conduct is not limited as provided for in this Agreement.  My skills, education, and/or experience are such that my compliance with the restrictions provided for in this Agreement during and after my employment will not place an unreasonable burden on me or prevent me from earning a living.  I agree that the restrictions provided for in this Agreement are narrowly tailored to protect the Company's trade secrets and other legitimate protectable interests.

2.        Conflicts of Interest / Duty of Loyalty.  I accept a duty of loyalty that includes the obligation:  (a) to devote my best efforts to my employment duties, (b) to promptly notify the Company of business opportunities related to the Company's line of business without pursuing them independently for personal gain without the written authorization of the Company, (c) to avoid competing with the Company, assisting others in their efforts to compete with the Company, or otherwise engaging in conduct that creates a conflict of interest under Company policy, and (d) to avoid knowingly interfering with key business relationships (such as customers, employees, and suppliers) for the benefit of any person or entity who is engaged in, or preparing to engage in a competing business enterprise.

3.        Confidential Information Obligations.   I agree that during my employment and for so long thereafter as the information qualifies as Confidential Information under this Agreement, I will not engage in any use or disclosure of Confidential Information that is not authorized by the Company and undertaken for the benefit of the Company.   I understand that this obligation applies to Confidential Information acquired by me during my past, present, or future employment with the Company, and includes information I create or compile in the course of my employment.  I will comply with all Company policies and directives concerning the use, storage, and transfer of Confidential Information.  These obligations do not prohibit my use of generally available knowledge, skill and education that is not specific to the Company or its business relationships but is instead knowledge generic to the industry or my profession. Unless prohibited by law from doing so, I will notify the Company as quickly as possible after being served with a subpoena, court order, or other legal mandate requiring the production of Confidential Information so that the Company can take reasonable steps to protect its interests and will cooperate in same.  I

will retain no records of Confidential Information after employment ends without written Company authorization to do so. I understand that nothing in this Section 3 shall prohibit Protected Conduct (described in Section 8 below).

3.1 "Confidential Information" refers to information and compilations of information, in any form (tangible or intangible), related to the business of the Company that I first gain knowledge of or access to as a consequence of my employment with the Company if the Company has not made it public or authorized public disclosure of it and it is not readily available through lawful and proper means to the public or others in the industry who have no obligation to keep it confidential. Confidential Information shall be understood to include any and all Company trade secrets (as defined under applicable state or federal law), but an item need not be a trade secret to qualify as Confidential Information. An item of Confidential Information will ordinarily constitute a trade secret under state or federal law if (a) it derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable by proper means by, other persons who can obtain economic value from its disclosure or use, and (b) it is the subject of efforts that are reasonable under the circumstances to maintain its secrecy. Something is not acquired through proper means if acquired through theft, bribery, misrepresentation, breach, or inducement of a breach of a duty to maintain secrecy by contract or otherwise, or espionage through electronic or other means. Confidential Information will not include my terms and conditions of employment or those of other Company employees except where the information concerning other employees has been entrusted to me as a supervisor or manager or otherwise entrusted to me as part of confidential job duties (such as human resource management, payroll, or benefits administration) (a "Confidential Role").

3.2 Examples of Confidential Information shall be presumed to include, but are not limited to, the following nonpublic items of information: the Company's (a) product research and development; product construction and specifications; data from clinical studies and trials; business plans and analyses; customer and prospective customer lists, contacts, and analyses; marketing plans and strategies; sales plans and strategies; pricing and pricing strategies; buying practices; vendor or supplier contacts, discounts, and other terms; financial data, reports, and analyses; operational data and processes; manufacturing, engineering, and testing processes; information regarding potential acquisitions or divestitures; business strategies and plans; communications with legal counsel; and (b) computer programs and listings (whether in source code and/or object code format), software design and methodology, techniques, technical data, methods, know-how, innovations, test results, models, algorithms, and un-patented inventions; and (c) Third-Party Confidential Information (described below). "Third-Party Confidential Information" refers to information entrusted to the Company by third parties, such as but not limited to investors, customers, employees, and suppliers, that the Company is obligated to maintain as confidential under controlling agreements with the third-parties or under controlling laws or regulations (such as regulations governing personal identifying information like social security numbers). All confidentiality and handling obligations regarding such information, whether created by agreements with the third parties or through applicable laws, regulations, or other legal requirements, will be complied with by me at all times.

4. Protective Covenants. I acknowledge that some activities by me would, by their nature and irrespective of my intent, involve conversion of Company trade secrets and other Business Investments to the unfair advantage of competitors if engaged in shortly after my employment ends. To avoid the irreparable harm that would be caused by conduct of this nature, and *subject to any state-specific exceptions or modifications provided for in Section 14 that may apply to me based on my Controlling State*, I agree to comply with the reasonable limitations below (collectively referred to as my "Protective Covenants"), after my employment with the Company ends (my "Termination Date"):

4.1     For a period of twelve (12) months after Employee's Termination Date, I will not provide services to a Competitor in any role or position (as an employee, owner, director, consultant or otherwise) that would involve Competitive Activity within or related to the Restricted Area.  This is Employee's "Noncompete" covenant.

4.2     For a period of twelve (12) months after Employee's Termination Date, I will not, for the benefit of a Competitor, solicit or assist others in their efforts to solicit a Covered Customer for the purpose of providing Competitive Products or Services to the Covered Customer, or for the purpose of causing or encouraging the Covered Customer to cease or reduce the extent to which the customer does business with the Company.  This is Employee's "Customer Nonsolicit" covenant.

4.3     For a period of twelve (12) months after Employee's Termination Date, I will not, for the benefit of a Competitor, directly or through assistance to others, participate in soliciting a Covered Worker to leave his/her/their employment or other engagement with the Company or assist a Competitor in efforts to hire a Covered Worker away from the Company without the Company's written approval in advance.  This is Employee's "Worker Nonsolicit" covenant.

4.4     For purposes of the forgoing Protective Covenants, the following definitions will apply:

(a)     "Competitor" refers to any business (person or entity) that is engaged in or preparing to engage in providing Competing Product or Services.

(b)     "Competing Products or Services" are products or services that would replace, displace the business opportunities for, or otherwise compete with the products and/or services provided by any part of the Company's business that I had material involvement with or was provided Confidential Information about in the Look Back Period.

(c)     "Competitive Activity" is activity that involves (i) providing services to or for a Competitor that are the same as or similar in function or purpose to the services I provided to the Company during employment with the Company (inclusive of employment with an acquired business that is now part of the Company) in the two years that precede the Termination Date (the "Look Back Period"), (ii) servicing or accepting business from a Covered Customer that is related to a Competing Product or Service, (iii) owning, operating, or managing a business that is a Competitor, (iv) soliciting, encouraging, or inducing a supplier, distributor, vendor, insurer, finance provider, referral source, or other key service or business provider of the Company to cease or reduce doing business with the Company, or (v) participating in other activity that is likely to result in the use or disclosure of Confidential Information for the benefit of a Competitor.

(d)     "Covered Customer" means a customer of the Company that I have material contact with in the Look Back Period.  Material contact will be presumed present if in the Look Back Period (i) I (or persons under my supervision) provided services to or had business-related contact with the customer on behalf of the Company, (ii) I was provided Confidential Information about the customer, or (iii) I received commissions, compensation, or other beneficial credit from the Company for business conducted with the customer.  Customers will be presumed to include active customer prospects as of the Termination Date that I have material contact with or I am provided Confidential Information about in the Look Back Period.

(e)     "Restricted Area" refers to the geographic locations of the Covered Customers and each geographic area, by state, county, or other recognized geographic boundary used in the ordinary course of the Company's business

that is assigned to me as a limitation on where I am to do business for the Company in the Look Back Period if my responsibilities for the Company and access to Confidential Information are limited to a specific geographic territory of this nature.  If no such limitation on duties and information applies, or the foregoing scope of Restricted Area is not enforceable, then the Restricted Area shall be the state(s) where I reside in the Look Back Period and those where I perform work for the Company in the Look Back Period, and each additional state within the United States and state equivalents in other countries where the Company does business that I have material involvement with or I am provided Confidential Information about in the Look Back Period to the extent the Company continues to do business therein.

(f)        To "solicit" or "soliciting" and their derivations mean to interact with another person or entity with the purpose or foreseeable result being to cause, motivate or induce the person or entity to engage in some responsive action (such as starting, modifying, or ending a business relationship), irrespective of who first initiated contact.  It shall not include general advertising (such as "help wanted" ads) that are not targeted at the Company's employees or customers.

4.5        The restrictions in the Protective Covenants described above will be subject to the following limitations:

(a)        Notwithstanding anything in this Agreement to the contrary, nothing prohibits Employee from owning a non-controlling interest consisting of two percent (2%) or less of any class of securities in any publicly traded company.

(b)        Nothing in the Noncompete shall be construed to prohibit Employee's employment in a separately operated subsidiary or other business unit of a company that would not be a Competitor but for common ownership with a Competitor so long as Employee provides written assurances regarding the non-competitive nature of Employee's position that are satisfactory to the Company and Employee's new employer confirms this understanding.

(c)        Employee's Worker Nonsolicit and Customer Nonsolicit covenants are understood to be reasonably and logically limited by geography to those locations where the Covered Workers and Covered Customers are located and available for solicitation and no further geographic limitation is necessary to make these restrictions reasonable.  However, if a different form of geographic limitation is necessary to make one of these restrictions enforceable under controlling law, then the restriction(s) that need it for enforceability shall be considered limited to the Restricted Area.

(d)        No restriction in this Agreement will be construed to prohibit a licensed attorney from engaging in the practice of law.

5.        Company Records and Property / Return of Property Obligations.   All records related to the Company's business activities and business development efforts created in the course of the Company's business (such as contact lists, prospect lists, calendars, and notes), whether made by me or others, and wherever stored (in email, text messages, cell phones, computers or otherwise) are the property of the Company ("Company Records").  I understand that I am not authorized to use these Company Records or to access and use the Company's computers, email, or related computer systems, to pursue competitive business interests. I recognize that accessing Company computer systems to compete or prepare to compete is unauthorized access and strictly prohibited.  All electronic files and similar items stored on Company owned, issued, or sponsored devices or accounts are Company property

unless otherwise agreed in writing as to a specific item, and I shall have no expectation of personal privacy with regard to any such stored items. I will preserve and maintain records of Company customers, prospects, suppliers, and other business relationships as Company Records, and will not knowingly use these records to harm the Company's business interests. Upon termination of employment or earlier if requested, I will return all Company property including Company Records and any copies (tangible and intangible, electronic files, email, and otherwise) to the Company. Upon request, I will provide the Company reasonable means to verify that no Company Records and/or Confidential Information have been retained by me on personal computers, cell phones, email, or cloud storage accounts, or in any other place that is subject to my control without the Company's authorization after employment ends. Nothing herein prohibits me from retaining records provided to me by the Company concerning my own compensation, benefits, and agreements with Company.

6. <u>Special Remedies</u>. Due to the nature of my obligations, a violation of this Agreement by me would likely cause not only actual and compensable damage, but also irreparable harm and continuing injury to the Company for which there would not be an adequate remedy at law. Accordingly, if I should breach or threaten to breach this Agreement, the Company shall be entitled to seek equitable remedies in the form of temporary and permanent injunctive relief to enforce this Agreement in addition to, and not in lieu of, any and all other legal remedies to which it would otherwise be entitled. In the event that the Company pursues legal action to enforce the terms of this Agreement due to a breach or threatened breach by me, the Company shall be entitled to recover from me all costs and expenses, including without limitation, reasonable attorney's fees and expenses (including expert witness and investigation fees, and court costs) incurred by the Company in connection with such litigation, in addition to any and all other rights and remedies; provided, however, that if controlling law would convert the forgoing provision into a reciprocal obligation whereby either prevailing party could recover attorney's fees and expenses, then each party will bear its own attorney's fees and expenses.

7. <u>Fairness Extension</u>. If I breach one of the post-employment restrictions in this Agreement for which there is a specific time limitation, the post-employment period of the breached restriction will be extended for an additional period of time equal to the time that elapses from commencement of the breach to the later of (a) the definitive termination of such breach or (b) the final resolution of any litigation arising from such breach; provided, however, that this extension of time shall be capped so that the extension of time itself does not exceed the length of time originally proscribed for the restriction or a maximum of one year, and if this extension would make the restriction unenforceable under controlling law it will not be applied. This shall be referred to as the "Fairness Extension."

8. <u>Protected Conduct</u>. Nothing in this Agreement prohibits me from opposing or reporting to the relevant law-enforcement agency (such as but not limited to the Securities and Exchange Commission (SEC), Department of Labor, National Labor Relations Board, Equal Employment Opportunities Commission, Occupational Safety and Health Commission) an event that I reasonably and in good faith believe is a violation of law, obligates me to inform the Company before or after making such a report, prohibits me from cooperating in an investigation conducted by such a government agency, limits or affects my right to disclose or discuss criminal conduct, discrimination, harassment (including but not limited to sexual harassment or sexual assault) or retaliation, prohibits me from discussing such matters with my own legal counsel, or prohibits me from providing truthful testimony in a legal or adjudicatory proceeding (such as a judicial, administrative, or arbitration proceeding). I acknowledge notice that under the Defend Trade Secrets Act (DTSA) no individual may be held criminally or civilly liable under Federal or State trade secret law for a trade secret disclosure that complies with 18 USC §1833(b); such as a disclosure (i) made in confidence to a Federal, State, or local government official, directly or indirectly, or to an attorney; and made solely for the purpose of reporting or investigating a suspected violation of law; or, (ii) made in a complaint

or other document filed in a lawsuit or other adjudicatory legal proceeding, if such filing is made under seal. Also, under this law an individual pursuing a legal claim for retaliation by an employer for reporting a suspected violation of the law may disclose a trade secret to his/her attorney and use it in documents filed in the adjudicatory proceeding under seal provided he/she does not engage in disclosure except pursuant to order of the adjudicator. The conduct protected under this Section 8 is collectively referred to as "Protected Conduct." This Protected Conduct section shall not be construed to protect, invite, permit, or limit liability for illegal activity such as breaking and entering, illegal computer access (hacking) or theft or destruction of Company property.

9.      Beneficiaries, Successors, and Assigns. "Affiliate" refers to any legal entity or organization that is directly, or indirectly through one or more intermediaries, controlling, controlled by, or under common ownership or control of Galderma Holding AG, or a successor thereof. This Agreement shall inure the benefit of, and may be enforced by any of Galderma's Affiliates, successors, and assigns who have a protectable interest covered by this Agreement. I agree to the assignment of this Agreement by Company and all rights and obligations hereunder, including, but not limited to, an assignment in connection with any merger, sale, transfer, or acquisition consummated by Company, its parent, or any of their Affiliates, or relating to all or part of their assets. My obligations under this Agreement are personal in nature and may not be assigned by me to someone else.

10.     Complete Terms, Modification and Waiver.   The Parties are not relying upon any representations, agreements, terms, or conditions not contained within this document in making the decision to enter into it. This Agreement is the full and complete agreement of the Parties with regard to the matters covered in it. I agree that the Company will have the right, through a written notice to me, to rescind any restriction placed upon me or to reduce the boundaries of any restriction applicable to me under this Agreement (such as time, scope of activity, or geography) at any time as it deems necessary for enforcement. The Company's rights under this Agreement can only be waived or modified in a writing executed by a Company representative expressly authorized to modify this Agreement and cannot be waived orally or through the Company's failure to take action to enforce this Agreement or any comparable agreement against me or any other person.

11.     Choice of Law and Venue.   The laws of the state where I am primarily employed with the Company when last employed (the "Controlling State") will control the interpretation and application of this Agreement without regard to any conflicts of law principles of any other state to the contrary; provided, however, that if the Parties have entered into an arbitration agreement that includes claims arising from this Agreement, then the Federal Arbitration Act, U.S.C. § 1 et seq. shall control as to all arbitration rights. I consent to the personal jurisdiction of the courts of proper subject matter jurisdiction located in the Controlling State, and I waive any objections to the exercise of jurisdiction over me by such courts (whether based on convenience, cost, location of witnesses or evidence, or otherwise).

12.     Employment Termination Rights Unchanged / Advice of Legal Counsel.   Nothing in this Agreement modifies or places a limitation on either Parties' right to end the employment relationship at the Party's discretion. I acknowledge that I have been advised to seek legal counsel with respect to this Agreement, and was provided an opportunity to do so if desired.

13.     Counterparts, Electronic Signature and Effective Date.  This Agreement may be executed in two or more counterparts, each of which will be deemed an original, but all of which together will constitute one and the same instrument. Counterparts may be executed and delivered via facsimile, electronic mail, or other electronic means. By executing electronically, I consent to execution of this Agreement by electronic means such as by selecting (through a click, mark, or other option) indicating "I Accept" through use of any device, means or action provided,

and I agree that execution of this document by such means is as valid as if I signed the document in writing.  This Agreement shall be considered made on the date signed by me below which shall be the effective date of this Agreement unless entering into this Agreement was or is a condition of my initial employment in which case the terms of this Agreement are understood to be operative upon the inception of my employment (whether reduced to a signed writing on that specific date or not).

14.       State-Specific Exceptions and Modifications.

California.  *In the event that I primarily reside or work in California, then irrespective of where I sign this Agreement or where I work for the Company, the following will apply to me*:  The Protective Covenants (Noncompete, Customer Nonsolicit, and Worker Nonsolicit) will not be applicable to me.  However, conduct involving misappropriation of Company trade secrets will remain prohibited and nothing in this Agreement shall be construed to limit or eliminate any rights or remedies the Company would have against me under trade secret law, unfair competition law, or other laws applicable in California absent this Agreement.  Nothing in the Agreement shall be construed to prohibit me from disclosing information about unlawful acts in the workplace, such as harassment or discrimination or any other conduct that I have reason to believe is unlawful.

Georgia.  *If the Controlling State is Georgia, then:*  The definition of the Restricted Area referred to in the Agreement shall be understood to be the territory where I am working at the time of termination and I stipulate that the provisions of the Agreement provide me with adequate means to reasonably determine the maximum scope of the restraints placed upon me at the time of employment termination.  The definition of Competing Products and Services will be further limited to products and services of the type conducted, authorized, offered, or provided by me as an employee of the Company in the two years prior to the Termination Date.  The Fairness Extension shall be limited so that it does not cause any of the Protective Covenants to run longer than two years from the Termination Date.  The Worker Nonsolicit will be limited by geography to the Restricted Area. The definition of Confidential Information shall exclude data or information (A) which has been voluntarily disclosed to the public by the Company, except where such public disclosure has been made by the me without authorization from the Company; (B) which has been independently developed and disclosed by others; or (C) which has otherwise entered the public domain through lawful means.

Massachusetts.  *If the Controlling State is Massachusetts, then*:  The Noncompete will not apply if  my employment is terminated without "cause" or as part of a reduction in force.  For this purpose only, "cause" exists if I have (i) committed, admitted committing, or plead guilty to a felony or crime involving moral turpitude, fraud, theft, misappropriation, or dishonesty, (ii) violated a material term of this Agreement or Company policy, (iii) engaged in insubordination, or failed or refused to perform assigned duties of my position despite reasonable opportunity to perform, (iv) failed to exercise reasonable care and diligence in the exercise of my duties for the Company, or (iv) engaged in conduct or omissions that I knew, or should have known (with the exercise of reasonable care), would cause, or be likely to cause, harm to the Company or its reputation in the business community.  The Fairness Extension will not apply to the Noncompete but if I should breach the Noncompete covenant and also breach any fiduciary duty I have to the Company and/or I unlawfully take, physically or electronically, any Company Records, then the Restricted Period shall be extended to a period of two (2) years from the Termination Date.  The Noncompete shall not apply to me if I am classified as a non-exempt employee under the FLSA, I am 18 years or younger, or I am an undergraduate or graduate student in an internship or other short-term employment relationship while enrolled in college or graduate school.  If I am being hired or retained as an employee in Massachusetts at the time this Agreement is entered into, then: The Parties agree that the award provided to me under the Galderma Long-Term Incentive Plan is mutually agreed upon, fair and reasonable consideration for the

Noncompete.  If I am signing this Agreement when initially hired by the Company, I acknowledge that I received a copy of this Agreement prior to receiving a formal offer of employment from the Company or at least ten (10) business days before commencement of my employment, whichever came first; and if I was already employed by a Company entity at the time of signing this Agreement, I was provided a copy of this Agreement at least ten (10) business days before the effective date of this Agreement.

Nebraska.  *If the Controlling State is Nebraska, then:*  The Noncompete covenant shall not apply to me after my employment with the Company ends.  The Customer Nonsolicit clause will be revised to provide only that I will not solicit, sell to, divert, serve, accept, or receive competing business from any customer or active prospective customer of Company that I personally, alone or in combination with others, handled, serviced, or solicited at any time during the Look Back Period.

New York.  *If the Controlling State is New York, then*:   The Customer Nonsolicit covenant is modified to provide that a customer of Company that becomes a customer solely as a result of the contact and business development efforts that I engaged in with the customer prior to and independent from my employment with Company will not be considered a "Covered Customer."

North Carolina.  *If the Controlling State is North Carolina, then*:  The definition of "Look Back Period" is modified to provide that the Look Back Period will be reduced from two years to one year.

By signature below, the Parties hereby knowingly and voluntarily agree to be legally bound to the terms of the Agreement stated above.

EMPLOYEE

GALDERMA LABORATORIES, L.P.

DocuSigned by:

*Erick Brenner*

862775A420E94EC...

_____

Signature

_____

Signature

Erick Brenner

_____

Employee's Name Printed

Its: President

_____

Date: 07-Jun-24
_____